FILED
09/28/2017
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 28, 2017 Session

## SHAYLA NICOLE PURIFOY v. DEVINE MAFA

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT00085414     Donna M. Fields, Judge**

_____

### No. W2015-00102-COA-R3-CV

_____

After a lengthy hearing, the trial court granted an order of protection to the appellee based upon its finding that the appellant was stalking and harassing her. The trial court denied the appellant's counter-petition for an order of protection. The appellant raises ten issues on appeal. For the following reasons, we affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Carol Chumney, Memphis, Tennessee, for the appellant, Devine Mafa.

Marty Brett McAfee, Memphis, Tennessee, for the appellee, Shayla Nicole Purifoy.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

The parties to this appeal have been involved in three separate lawsuits. Shayla Purifoy worked as a staff attorney at Memphis Area Legal Services and represents victims of domestic violence. Devine Mafa is an occupational therapist who came to the United States from Zimbabwe around 2000.

In March 2013, Ms. Purifoy testified at an order of protection hearing involving Dr. Mafa. The petitioner in that proceeding was a student Ms. Purifoy knew from coaching a mock trial team. The student had previously dated Dr. Mafa and was seeking to extend an order of protection against him; Dr. Mafa was also seeking an order of protection against the student. Ms. Purifoy testified very briefly, for approximately five

minutes, about factual matters. She testified regarding the mock trial team's cell phone policy and whether the student would have had access to her phone at a time when she allegedly sent messages to Dr. Mafa. Ms. Purifoy was also asked if she had seen Dr. Mafa outside of court, and she described an incident in which she had observed him being detained by police outside a bar called the Silly Goose. The proceeding was eventually dismissed, with no order of protection being entered in favor of either the student or Dr. Mafa.

Approximately eight months later, in early December 2013, Ms. Purifoy received a "friend request" from Dr. Mafa on Facebook. Dr. Mafa's Facebook page was not titled with his own name but was under the alias "Steele Balz." However, Ms. Purifoy recognized that the page belonged to Dr. Mafa because some of her mock trial students had showed her the page in the past. Ms. Purifoy did not accept Dr. Mafa's friend request. Shortly thereafter, Ms. Purifoy was contacted by some of her colleagues who alerted her to the fact that Dr. Mafa was posting videos about her publicly on Facebook. One video contained the written title: "Arrest this BLACK MAN BECAUSE HE'S BLACK. MY PROSECUTION BY AN #ANGRYBLACKWOMAN – ESQ SHAYLA NICOLE PURIFOY." The other video contained a caption stating that Ms. Purifoy lied and "used Racial Codes on the stand" that would make the KKK smile and honor her as the grand wizard. In the lengthy videos, Dr. Mafa "ranted" about his experience with Ms. Purifoy and spoke directly to her, stating things like,

> For you as a black woman, you should know better. You should have your mind checked out. You should know that you don't do that. . . . [Y]ou are a shame. Shayla Nicole, you are a shame. You should be ashamed of yourself. Anyway, I had to rant to you a little bit . . . .
>     . . . . You should be ashamed of yourself, Shayla Nicole. I didn't know your name then. I know it now.

Dr. Mafa stated in the video that Ms. Purifoy could get disbarred for her actions and mentioned calling "the Board" but said that he was not going to do that to another black professional. However, he said, "that hurt me. It crushed my heart." Dr. Mafa said in the video he initially thought that Ms. Purifoy was beautiful and elegant but that he no longer did. In the second video, Dr. Mafa called Ms. Purifoy "a racist lawyer" and said that her actions rose "to a level of impropriety when it comes to the Board of Professional Responsibility." He said he hoped that one day he could forgive her, but he also compared her actions to someone going to war with chemical weapons and said, "that's not acceptable, you'll be held responsible."

On December 14, 2013, Ms. Purifoy contacted Dr. Mafa by sending him a private

2

message on Facebook.  She asked Dr. Mafa to remove her photographs from his posts and to discuss any issues with her directly rather than posting in a public forum.  She explained that she testified truthfully under oath and asked him not to tarnish her reputation in the community.  Dr. Mafa did not respond to this message or remove the posts.

On December 19, 2013, Ms. Purifoy filed a complaint in circuit court against Dr. Mafa alleging defamation in the form of libel and negligent or intentional infliction of emotional distress.  She sought an immediate temporary restraining order and also permanent injunctive relief regarding the public posts and video statements.  That same day, the circuit court entered a temporary restraining order enjoining Dr. Mafa from posting Ms. Purifoy's name or pictures online or in any format; contacting Ms. Purifoy, her family, or her employer directly or indirectly; entering the building where she worked for any purpose; being present in any location where she was located; or speaking publicly about the case.  Dr. Mafa was also ordered to remove all posts about Ms. Purifoy immediately.

The complaint and temporary restraining order both contain a certificate of service indicating that they were mailed to Dr. Mafa's residence.[1]  Service on Dr. Mafa was attempted by the sheriff's office and a private process server, but their attempts were unsuccessful.  However, Dr. Mafa apparently became aware of the lawsuit because another lengthy message was posted on his Facebook page later in December, with the following statements:

---

[1]Ms. Purifoy's complaint asserted that prior notice to Dr. Mafa of the request for a temporary restraining order was not necessary pursuant to Tennessee Rule of Civil Procedure 65.03(1)(B) "owing to the potential danger of physical harm."  Rule 65.03(1)(B) provides:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
> . . . .
> (B) the applicant's attorney (or pro se applicant) certifies in writing efforts made to give notice and the reasons why it should not be required.

3

IN THE CIRCUIT COURT OF TENNESSEE FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS SHELBY COUNTY

SHAYLA NICOLE PURIFOY
plaintiff
Vs
THE GREAT Steele Balz AKA #GOD

Motion to Dismiss Plaintiffs complaint

Hey Yee Lord, Judge in the chamber wearing the black hood looking all important, comes he before yee this scholarly defendant named Steele Balz. He seek[s] to dismiss and throw away this docket into the trash where the pigs reside. . . . [C]ommunication decency act CDA 47 U.S.C. 230-c-1 provides gives him his godly powers to speech as he pleases on the computer. . . .
. . . .
. . . . Your judgement for her would change American law and warn you. [W]e are watching you judge.

Around Christmas, Dr. Mafa continued to post additional pictures of Ms. Purifoy, apparently obtained from a Young Lawyers Division bulletin, juxtaposed beside pictures of his ex-girlfriend (the student from the mock trial team).

On December 31, 2013, Ms. Purifoy and Dr. Mafa had an encounter at the Silly Goose bar. Ms. Purifoy had previously informed the bouncer that she was trying to obtain service of process on Dr. Mafa. When she arrived with a friend on New Year's Eve, the bouncer told them that Dr. Mafa was inside. Ms. Purifoy called the private process server then proceeded inside. The private process server never came. Ms. Purifoy and Dr. Mafa had a brief encounter at the bar, but their versions of what occurred vary tremendously. According to Ms. Purifoy, she approached Dr. Mafa and said something along the lines of "Don't you think you shouldn't be here?", but Dr. Mafa acted like he did not know Ms. Purifoy, so she turned and walked away.

The next day, Dr. Mafa's Facebook page contained another photograph of Ms. Purifoy and a lengthy post about the New Year's Eve encounter, stating that "2014 started with WAR for me." According to Dr. Mafa's post, he was near the bar and saw Ms. Purifoy approaching him and pointing at him, then she cursed at him and told him that he had better leave. Dr. Mafa's post said that Ms. Purifoy "looked kinda cute last night and my heart softened." He continued to describe her body and appearance and

4

said she "was turning me on" by making wild gestures. The post stated that Ms. Purifoy "was almost close to punch me last night. i would have liked it." The next day, on January 2, Dr. Mafa contacted the Memphis Police Department and reported that Ms. Purifoy had assaulted him on New Year's Eve. According to Dr. Mafa's later testimony about the events, Ms. Purifoy approached him from behind and hit him in the back of the head then started punching him in the forehead and chest. Dr. Mafa said he became so scared that he almost lost consciousness.

After a hearing in the defamation suit, the circuit court entered a permanent injunction on January 13, 2014, prohibiting Dr. Mafa from doing the acts previously enjoined by the temporary restraining order. Dr. Mafa did not appear at the injunction hearing, but the circuit court's order states that Ms. Purifoy testified under oath. The circuit court's order references testimony that notice had been sent to Dr. Mafa via certified mail and that attempts were made to serve him by the sheriff's office and a private process server. The order states that "Defendant [h]as indicated through his own communications that he is aware of this filing (see attachment)."[2] The permanent injunction enjoined Dr. Mafa from posting Ms. Purifoy's picture or name online or in any format; contacting Ms. Purifoy or her family or employer; entering the buildings where she worked for any purpose; or being in any location where she was present.

Ten days later, on January 23, Dr. Mafa went to the Family Safety Center in Memphis. Ms. Purifoy maintains an office at the Family Safety Center, and she had previously provided pictures of Dr. Mafa to the security personnel at the Family Safety Center's security checkpoint. As a result, Dr. Mafa was not permitted to enter the building. According to Dr. Mafa, he went to the Family Safety Center in order to obtain an order of protection against Ms. Purifoy based on the alleged attack at the Silly Goose on New Year's Eve. Dr. Mafa claimed no knowledge of the fact that Ms. Purifoy maintained an office there. Despite the "motion to dismiss" posted on his Facebook page in December 2013, Dr. Mafa also claimed that this incident at the Family Safety Center on January 23, 2014, first made him aware of the defamation suit filed by Ms. Purifoy, as the security personnel informed him that there was a court order against him. On February 12, 2014, Dr. Mafa made his first appearance in the defamation suit, filing a motion to set aside the permanent injunction order on the basis that he had no notice of the proceeding before the entry of the injunction. Rather than seeking dismissal, however, Dr. Mafa's motion asked the court "to set aside the previous order of default entered in this matter and to reinstate the temporary injunction, and set a new hearing date that will give Defendant time to investigate and answer this complaint."

On February 20, 2014, Ms. Purifoy's identical twin sister allegedly saw Dr. Mafa

---

[2]Although the attachment is not in the record before us, we presume that the court was referencing the "motion to dismiss" posted to Facebook.

in the employee parking lot of the Family Safety Center as she left the building after-hours, shortly after 6:00 p.m. Dr. Mafa was allegedly parked right across from her car, where he was leaning against his vehicle smoking a cigar. She drove away without incident but informed Ms. Purifoy of the encounter.

On February 26, 2014, Ms. Purifoy instituted this action by filing a petition for order of protection in circuit court, alleging that Dr. Mafa was stalking her.[3] On the same day the petition was filed, the circuit court entered an ex parte order of protection pursuant to Tennessee Code Annotated section 36-3-605(a) upon finding that Ms. Purifoy was under an immediate and present danger of abuse.[4] The ex parte order of protection prohibited Dr. Mafa from contacting, stalking, threatening, abusing, or coming about Ms. Purifoy for any purpose. The ex parte order of protection provided that a hearing would be held two days later on February 28, 2014.

A hearing was held on February 28, 2014. We do not have a transcript of the hearing in the record before us, but the written orders entered after the hearing address matters from both the defamation case and the order of protection case. The circuit court entered a "Transfer and Joinder Order," which states:

> Comes now the Plaintiff, Shayla Purifoy, by and through her attorney of record, Marty McAfee and makes an oral motion to transfer the Petition for Order of Protection and Hearing from Division III to Division 1, due to a related matter, CT-005435-13, being heard in Division I. Plaintiff also requests that such matter be joined with docket number CT-005435-13, as a separate cause of action, due to judicial efficiency. This does not preclude Plaintiff from receiving separate remedies available through each cause of action but allows related matters to be heard simultaneously as the Court deems appropriate.

The Transfer and Joinder Order was signed by the judge approving the transfer, Judge Karen Williams, and also by the judge accepting the transfer, Judge John McCarroll. Judge McCarroll also signed a "Continuance Order" on February 28 stating that the motion to set aside the permanent injunction (filed in the defamation case) came before the court and was continued until a later date when the petition for order of protection

---

[3] The order of protection case was assigned a separate docket number from the defamation case also pending in circuit court.

[4] Tennessee Code Annotated section 36-3-605 sets forth the procedures by which a victim of domestic abuse, stalking, or sexual assault may obtain an order of protection. Tennessee Code Annotated section 36-3-605(a) provides that "[u]pon the filing of a petition under this part, the courts may immediately, for good cause shown, issue an ex parte order of protection. An immediate and present danger of abuse to the petitioner shall constitute good cause for purposes of this section."

would also be heard. The order states that "[t]he Petition for Order of Protection, [and] Ex Parte Order of Protection . . . were filed by Plaintiff and hand-delivered to <u>Defendant Devine Mafa/Defendant's Attorney (circle)</u> in court on February 28, 2014 at 11 AM." The court entered another ex parte order of protection and set a hearing for April 4, 2014. On April 4, however, a continuance order was entered continuing the hearing on both matters "at the request of [Dr. Mafa]." The order provided that the ex parte order of protection and permanent injunction would remain in place until the next hearing on May 30. On May 30, the matter was continued again until July 17.

On July 17 and 18, Judge McCarroll heard testimony regarding the petition for an order of protection. The executive director of Memphis Area Legal Services was called to testify as the last witness, which led Judge McCarroll to advise the parties that he had solicited contributions for Memphis Area Legal Services in connection with a "Campaign for Equal Justice." Dr. Mafa requested recusal, and Judge McCarroll entered an order recusing himself that same day. Also on July 17, Judge Gina Higgins signed another ex parte order of protection by interchange and set the matter for hearing on August 29.

Judge Donna Fields signed an additional ex parte order of protection on August 29 and set the matter for hearing on September 26. A flurry of activity occurred in the case in September before the hearing. Dr. Mafa sought to depose Ms. Purifoy. Because he had also recently filed a pro se motion to dismiss the defamation case that included outrageous allegations against Ms. Purifoy,[5] she filed a motion for a protective order precluding her deposition and a motion to seal the case. Days before the hearing set for September 26, Dr. Mafa filed a counter-petition seeking an order of protection against Ms. Purifoy, alleging that she was stalking him. Thereafter, his attorney moved to withdraw.

At the hearing before Judge Fields on September 26, 2014, she granted the motion to withdraw filed by Dr. Mafa's attorney and entered an order sealing the record. Judge Fields indicated that her priority was to have a hearing on the petition for order of protection prior to resolving the defamation case. She asked Dr. Mafa to retain another attorney as soon as possible and set the final hearing in the order of protection case for October 2014.

Dr. Mafa filed a request for a thirty to ninety day continuance to allow him to conduct discovery and retain another attorney. He also requested an interpreter. At a hearing on October 10, 2014, Judge Fields denied Dr. Mafa's request for an interpreter, observing that he has two PhD's from the University of Oxford and the University of Cambridge in England and "speaks perfect English." Judge Fields also ruled against Dr.

---

[5]Dr. Mafa had an attorney but filed this motion himself.

Mafa on some other matters and stated that the ex parte order of protection would be extended once again, until the date of the final hearing on October 27. After the hearing, Dr. Mafa filed a motion to recuse Judge Fields. He alleged that Judge Fields was biased against Facebook users and that she did not have the patience to allow him to articulate his speech. He also argued that recusal was warranted because Ms. Purifoy was a lawyer who had practiced in Judge Fields' courtroom. He claimed that Judge Fields had demonstrated bias by ruling in Ms. Purifoy's favor on various issues. In an amended motion for recusal, Dr. Mafa further alleged that he had been "regularly threatened with the bailiff." He asserted that Judge Fields was biased against foreigners, Facebook users, and non-attorneys. Ms. Purifoy filed a response to the recusal motion arguing that recusal was not warranted. She also represented that Dr. Mafa did not confer with her attorney before selecting Friday, October 24, 2014, as the hearing date for the recusal motion. In the response, Ms. Purifoy's counsel represented that he had a prior court date set on Friday, October 24, which could take considerable time and cause him to miss the hearing on the recusal motion. Counsel argued that no hearing was necessary for the recusal motion and suggested that "this decision can be made, *subject to the approval of the Court*, at the beginning of the hearing set on Monday, October 27, 2014 or prior to this hearing." (Emphasis added.) The record contains no action by the court in response to this request for the court to decide the matter without a hearing.

On Friday, October 24, 2014, counsel for Ms. Purifoy appeared at the hearing set by Dr. Mafa for his recusal motion. Dr. Mafa did not appear. The transcript of the October 24 hearing is in the record before us, and it indicates that the "hearing" lasted two minutes, from 9:32 to 9:34 a.m. The transcript of the exchange between Judge Fields and Ms. Purifoy's counsel spans only three pages. At the outset, Judge Fields asked Ms. Purifoy's counsel if he had received a copy of an email she had just received that morning from Dr. Mafa, in which he stated that he was "scared to come to [her] court" and "will not be present for the motion" but demanded that Judge Fields recuse herself or else he would file a board complaint against her. When counsel answered in the negative, Judge Fields replied that she was going to reset the recusal matter for the beginning of the previously scheduled final hearing on Monday. Because Dr. Mafa's proposed board complaint indicated that a tape would be provided to support his allegations, she asked counsel if there was a transcript of the previous two court appearances and said she would like to review those. Judge Fields also instructed counsel for Ms. Purifoy to send a letter to Dr. Mafa telling him that if he was recording the proceedings, he was to bring the tape and the person who was making the recording to the next hearing. Counsel for Ms. Purifoy then informed the court that he had also received a message from Dr. Mafa, the night before the hearing, which stated that Dr. Mafa had hired a private investigator to conduct extensive research about Ms. Purifoy and her attorney. Counsel for Ms. Purifoy informed the court that it gave him "great pause" and "quite a bit of concern" that Dr. Mafa had hired a private investigator in the

midst of an order of protection proceeding. Judge Fields directed him to take the message to the district attorney, stating, "This is getting out of control." Judge Fields added, "I will not be intimidated by some litigant who is representing himself pro se, and if he's afraid of me, that's his problem. But I suspect he's not afraid of me or you or anybody else."[6]

On Monday, October 27, 2014, Dr. Mafa appeared at the final hearing on the order of protection matter with a newly retained attorney. At the beginning of the hearing, Ms. Purifoy's counsel mentioned his appearance at the Friday hearing. Dr. Mafa's new attorney apologized on his behalf for the fact that he did not appear. After a lengthy discussion, Dr. Mafa's attorney announced that he was not pursuing the board complaint against Judge Fields. A written order was entered stating that Dr. Mafa had decided to proceed and withdrew his motion for recusal upon representations by the court that she could fairly and impartially decide the matter. The trial court heard extensive testimony over the course of two days regarding the petition for order of protection filed by Ms. Purifoy and the counter-petition for order of protection filed by Dr. Mafa. The court heard testimony from Ms. Purifoy, Dr. Mafa, and nine other witnesses. Several written posts and videos from Dr. Mafa's Facebook page were entered into evidence. At the conclusion of the hearing, the trial court announced her ruling in favor of Ms. Purifoy. The trial court found that Dr. Mafa was stalking and harassing Ms. Purifoy. The trial court referenced the Facebook videos and written posts by Dr. Mafa and concluded that they would give any reasonable person reason to be afraid of what he might do. Aside from the Facebook posts, the trial court found that Dr. Mafa was also seen in the parking lot of Ms. Purifoy's place of employment, at the Family Safety Center. The court also noted that Dr. Mafa sent an email to Ms. Purifoy's attorney stating that he had hired a private investigator to conduct extensive research on her, despite the existence of the ex parte order of protection and permanent injunction. The trial court found that Dr. Mafa's email "was sent for intimidation" and "can't be called anything but harassment or intimidation." The trial court also referenced proof introduced by Ms. Purifoy to suggest that Dr. Mafa had experienced many "incidents in the legal system" with numerous other individuals. The trial court concluded that "Mr. Mafa is a man who deals in drama. He's paranoid. He truly believes there's a conspiracy, that everyone's out there to get him." Based upon the court's conclusion that Ms. Purifoy was rightfully afraid of Dr. Mafa, the trial court granted Ms. Purifoy an order of protection against him for one year. The trial

---

[6]Ms. Purifoy's counsel sent the letter to Dr. Mafa as directed, via email and certified mail. It stated,

> You were not present in court today for the motions that you filed. Judge Fields indicated that you sent the Court an email. The Clerk has provided a copy of this email to me. Judge Fields struck your motion from today's docket due to your failure to follow procedure.

The letter went on to inform Dr. Mafa of the order by Judge Fields to bring to the Monday hearing any recordings he had made of the judicial proceedings and the person making such recordings.

court concluded that Dr. Mafa was not afraid of Ms. Purifoy, and it found his testimony that Ms. Purifoy struck him on New Year's Eve was not credible. The trial court denied his request for an order of protection. The trial court signed a standard form order of protection for Ms. Purifoy at the conclusion of the hearing, and it also entered a separate order with additional written findings thereafter and incorporated by reference its lengthy oral ruling.

On December 11, 2014, approximately six weeks after the conclusion of the final hearing, Dr. Mafa filed a "Request for Designation of Extra-County Judge Pursuant to Shelby County Circuit Court Local Rule Twenty-One." Dr. Mafa asked for an extra-county judge to hear the proceedings going forward, including his motion to reconsider or alter or amend or for new trial and Ms. Purifoy's pending request for attorney's fees, due to the fact that Ms. Purifoy practices as an attorney in Shelby County. The following day, the trial court entered an order partially granting Ms. Purifoy's request for attorney's fees pursuant to Tennessee Code Annotated 36-3-617.

Dr. Mafa filed a notice of appeal under the docket number of the order of protection case and a separate notice of appeal under the docket number of the defamation case, even though that case had not yet been tried. The notice of appeal for the order of protection case was also filed prematurely, after the conclusion of the final hearing but before the trial court entered its orders containing its factual findings and resolving the pending post-trial motions. On March 25, 2015, the trial court entered its orders granting Ms. Purifoy's petition for order of protection, denying Dr. Mafa's petition for order of protection, denying Dr. Mafa's request for an extra-county judge, and denying Dr. Mafa's motion to reconsider, alter or amend, or for new trial.

Ms. Purifoy filed an additional post-trial motion in the trial court seeking to correct a "clerical error" on the judgment awarding her attorney's fees due to the fact that it listed the docket number for the defamation case rather than the docket number for the order of protection case. Ms. Purifoy also filed a motion in the Court of Appeals seeking a remand for correction of this "clerical mistake." On October 5, 2015, this Court entered an order granting Ms. Purifoy's motion for a remand "for the limited purpose of correcting a clerical mistake on an order contained in the appellate record." This Court's order directed the circuit court clerk to transmit a supplemental record to this Court after entry of the corrected order. We denied a motion to reconsider or vacate this order, filed by Dr. Mafa, explaining that any differences regarding whether the record accurately discloses what occurred in the trial court are to be submitted to and settled by the trial court pursuant to Tennessee Rule of Appellate Procedure 24(e). On December 22, 2015, we entered an order dismissing the appeal that Dr. Mafa filed in the defamation case, as it was apparent that there was no final judgment resolving that matter.

While the appeal of the order of protection case was on remand for correction of the record, the parties discovered that a great deal of the filings from the order of protection case had been mistakenly filed in the record for the defamation case. At a hearing before Judge Fields on April 1, 2016, the parties' attorneys conceded that both parties had filed various documents listing the wrong docket number. Later in this same hearing, Dr. Mafa's counsel indicated that she had "briefed in the Court of Appeals" an argument suggesting that Judge Fields should be recused based on an ex parte communication that allegedly occurred prior to the final hearing. The following exchange occurred:

> THE COURT: Is there a motion for recusal?
>
> [Dr. Mafa's attorney:] No. I don't have a motion before the court today. I don't.

Judge Fields directed counsel to file a motion to recuse along with a transcript of the allegedly improper statement.[7] Then, regarding the motion to correct the record, Judge Fields directed the parties and their attorneys to meet with the clerk, sort through the files for both of the cases, and divide the filings between the two records based on their substantive content, not the docket number originally listed on the document.

Two months later, on June 1, 2016, Dr. Mafa filed a written "Memorandum of Law in support of the Motion for Recusal of Judge Fields."[8] He claimed that while reviewing the appellate record, he and his counsel "learned for the first time that the Court had an ex parte communication with opposing counsel [] on October 24, 2014." (This was the date of the two-minute Friday morning recusal hearing, when Dr. Mafa did not appear, before the final hearing commenced on Monday, October 27, 2014.) Dr. Mafa referenced the fact that Judge Fields directed counsel to take Dr. Mafa's message about the private investigator to the district attorney. Dr. Mafa alleged that this action "appeared to form an inappropriate pact" between Judge Fields and counsel for Ms. Purifoy and that he would not have withdrawn his recusal motion the following Monday if he had known about this instruction. Dr. Mafa argued that this statement, combined with other statements and rulings made by Judge Fields throughout the proceeding,

---

[7]A party seeking recusal of a judge of a court of record "shall do so by a timely filed written motion." Tenn. R. Sup. Ct. Rule 10B, § 1.01.

[8]It is not clear from the record whether Dr. Mafa ever filed a written *motion* for recusal aside from this memorandum of law. His memorandum merely states that "the issue of recusal was raised anew by his counsel" at the April 1, 2016 hearing before Judge Fields regarding correction of the record. In his brief on appeal, Dr. Mafa represented that he filed a motion to recuse on April 15, 2016, but we have not located that document in the voluminous record on appeal, which spans twenty volumes. The citation to the record provided by Dr. Mafa refers us only to an affidavit he filed in the defamation case in support of recusal.

entitled him to a new trial before a different trial judge. Ms. Purifoy filed a response, arguing that Dr. Mafa's recusal motion was untimely and also lacked substantive merit.[9]

On July 29, 2016, the trial court entered an "Order to Correct the Record" in both the defamation case and the order of protection case. The court found that numerous documents were filed by both parties with the wrong docket number, resulting in each of the court files containing filings clearly meant for the other case. The court found that the substance of the motions and transcripts was not affected by the erroneous numbering. As such, the court designated 63 separate filings and transcripts to be moved to the appropriate court file pursuant to Tennessee Rule of Appellate Procedure 24(e).[10] The parties also entered into a "stipulation order" providing that all documents from the defamation case would be included in the record in this appeal as well. Because Dr. Mafa had already filed his appellant's brief on appeal, he sought and was granted permission to file a new brief.

On August 30, 2016, Judge Fields entered an order addressing Dr. Mafa's recusal motion. Judge Fields found that Dr. Mafa's recusal motion was "replete with untrue, misstated and mischaracterized statements (by lack of context) which are carelessly presented, without proper investigation." The court discussed numerous statements and rulings that Dr. Mafa claimed showed bias and explained why each claim was meritless. As for the allegedly newly-discovered "ex parte communication" at the October 24, 2014 hearing, the trial court found:

---

[9]Dr. Mafa's memorandum in support of recusal stated that he and his counsel were reviewing the appellate record and "learned for the first time that the Court had an ex parte communication with opposing counsel, Marty McAfee on October 24, 2014." However, the record is clear that Dr. Mafa was aware of Mr. McAfee's appearance at the hearing on that date. The record contains the letter sent to Dr. Mafa by Mr. McAfee after the hearing, and his appearance was discussed at the beginning of the final hearing days later. In the facts section of Dr. Mafa's motion to alter or amend, he mentioned that "[o]n October 24, 2014, opposing counsel appeared in Court with regard to a Motion for Recusal filed by Mafa." Perhaps Dr. Mafa meant that he was not fully aware of the *substance* of the discussion at the October 24 hearing. However, in response to Ms. Purifoy's request for attorney's fees in December 2014, Dr. Mafa argued that Ms. Purifoy's counsel billed too many hours for the October 24, 2014 hearing because "the hearing commenced at 9:32 a.m. and concluded at 9:34 a.m." Thus, it appears that Dr. Mafa may have had access to a transcript of the hearing by December 2014.

[10]According to a separate order entered by the trial court,

> [The trial court] ordered the attorneys to sit down in the jury room and renumber and/or correct all of the pleadings that were misnumbered, or misfiled. Purifoy's attorney attended the ordered session. Mafa's attorney did not because she disagreed with this Court's interpretation of the Order from the Court of Appeals that more than one order was to be changed to straighten the files. This Court found that both files should be straightened up and numbered correctly, and that it was a waste of judicial economy not to correct the entire files.

Mafa has repeatedly complained that [Ms. Purifoy's counsel] Mr. McAfee had an ex parte communication with the Court, when in reality it was Mafa who sent an email to the Court without sending a copy to opposing counsel, which counsel appeared on a date Mafa had set that motion. The email was not only an ex parte communication, but was an outright threat that if this Court did not recuse itself that he (Mafa) would file a complaint to the Board of Judicial Conduct, which Mafa did and which was dismissed.

On the Motion date, Mr. McAfee, on behalf of Purifoy, attempted to call to the Court's attention an allegation of some sort of criminal behavior. This Court dismissed him and told him to go report that to the District Attorney, Amy [Weirich], who has criminal jurisdiction, because Circuit Court does not. Mafa felt that was an attempt on the part of the Court to get him into trouble in Criminal Court, and thus shows bias. It merely shows lack of Jurisdiction, and Mafa's paranoia.

(Paragraph lettering omitted.) In sum, the trial court found that Dr. Mafa's allegations were "terribly distorted and many untrue." The August 30, 2016 order concluded, though, with the following paragraph:

However, in light of this Court's retirement date of August 31, 2016, and not because of anything mentioned herein, this Court has chosen to recuse herself and leave Mafa and Purifoy to the next computer chosen judge. It is this Court's fervent hope that she will be in a distant state or country when this matter goes to trial.[11]

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Judge Donna M. Fields is recusing herself and refers this matter to the clerk for a randomly selected judge to hear the remainder of this matter.

On December 23, 2016, Dr. Mafa filed a motion to consider post-judgment facts in this Court, asking us to consider the fact that Judge Fields had recused herself from both cases on August 30, 2016. This Court denied the motion to consider post-judgment facts on January 20, 2017. However, the circuit court clerk supplemented the record on appeal with an additional volume containing the order of recusal and related filings, so they now appear in the record before us.

---

[11]The order of recusal was entered in both docket numbers. The mention of trial is an apparent reference to the defamation case.

13

## II. Issues Presented[12]

Dr. Mafa presents the following issues, as we perceive them, for review on appeal:

1.      Should the judgment be set aside due to the recusal of Judge Fields;[13]

2.      Did the trial court err in denying the post-trial motion for an extra-county judge filed pursuant to a local rule;

3.      Did the trial court err in entering an order of protection when Dr. Mafa was never served with a petition for order of protection;

4.      Did the trial court err in finding that Dr. Mafa stalked Ms. Purifoy;

5.      Was Dr. Mafa denied due process;

6.      Was evidence admitted contrary to the Rules of Evidence;

7.      Was the settlement demand email improperly admitted in violation of Dr. Mafa's right to gather evidence and defend himself;

---

[12]Dr. Mafa also raises an argument regarding whether the trial court was authorized to correct numerous filings in the two records when the order of remand from this Court stated that the motion to remand was granted "for the limited purpose of correcting a clerical mistake on *an order* contained in the appellate record." (Emphasis added.)  Tennessee Rule of Appellate Procedure 24(e) provides:

> (e) Correction or Modification of the Record. If any matter properly includable is omitted from the record, is improperly included, or is misstated therein, the record may be corrected or modified to conform to the truth. Any differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court. Absent extraordinary circumstances, the determination of the trial court is conclusive. . . .

"Omissions, improper inclusions, and misstatements may be remedied at any time, either pursuant to stipulation of the parties or on the motion of a party or the motion of the trial or appellate court."  Tenn. R. App. P. 24, Adv. Comm'n Cmt.  Accordingly, the trial court was authorized to enter its order fully correcting the two records pursuant to Rule 24(e).

[13]Although this Court denied Dr. Mafa's motion to consider post-judgment facts pertaining to the recusal, we choose to address the substance of this issue in this opinion.  *See* Tenn. R. App. P. 14 (providing that this Court may consider post-judgment facts "on its motion" and "in the discretion of the appellate court").  Both parties' briefs addressed the recusal issue.

8.	Was the impeachment evidence regarding police reports improperly admitted;

9.	Should the order of protection be reversed on the basis that the videos and/or postings constitute free speech;

10.	Was the judgment for attorney's fees filed in the register's office in violation of the seal on the case and should the seal be lifted.

Ms. Purifoy seeks an award of attorney's fees on appeal. For the following reasons, we affirm the decision of the circuit court and remand for further proceedings.[14]

### III. STANDARD OF REVIEW

A trial court's findings of fact are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *In re Estate of Ledford*, 419 S.W.3d 269, 277 (Tenn. Ct. App. 2013). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citation omitted). Appellate courts afford trial courts considerable deference when reviewing issues that hinge on the credibility of the witnesses because trial courts are uniquely positioned to observe the witnesses' demeanor and conduct. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). We review the trial court's resolution of legal questions de novo with no presumption of correctness. *Id.*

### IV. DISCUSSION

#### A.	The August 30, 2016 Order of Recusal

At the outset, we consider Dr. Mafa's argument that the order of protection and judgment entered after the two-day hearing in October 2014 must be set aside due to the order of recusal entered by Judge Fields on August 30, 2016. His brief on appeal relies on Tennessee Supreme Court Rule 10, Canon 2, Rule 2.11 Comment [2], which states:

A judge is obligated not to hear or decide matters in which disqualification

---

[14]We note that after Dr. Mafa filed his brief on appeal, on two separate occasions he filed "supplemental authorities" for consideration pursuant to Tennessee Rule of Appellate Procedure 27(d). However, the "authorities" he submitted are orders entered in the order of protection case involving the mock trial student and in the defamation case after remand from this Court. These orders were not included in the appellate record and are not the type of "authorities" that will be considered by this Court simply by submitting them pursuant to Rule 27(d).

is required, even though a motion to disqualify is not filed.

We discern no merit in Dr. Mafa's argument. The order entered by Judge Fields on August 30, 2016, makes clear that she did not consider *any* of the allegations in Dr. Mafa's recusal motion as having substantive merit. She found that the motion was "replete with untrue, misstated and mischaracterized statements" that were "carelessly presented, without proper investigation." Based on these findings, disqualification was not *required* either on August 30, 2016, or, more importantly, at the time of the final hearing in October 2014. For whatever reason, Judge Fields curiously decided to recuse herself because of her retirement the very next day "and not because of anything mentioned herein." However, this fact does not mean that she was disqualified from hearing the matter in 2014, and, given the unique circumstances of this case, it is not necessary to set aside the 2014 orders and remand for a new hearing due to her recusal nearly two years later. *See Whack v. Seminole Mem'l Hosp., Inc.*, 456 So. 2d 561, 564 (Fla. Ct. App. 1984) ("Entering the order of recusal did not absolve the court of jurisdiction for those acts taken prior to recusal, nor did recusal result in making those orders previously entered void.").

## B.   *Request for Designation of Extra-County Judge pursuant to Local Rule*

On December 11, 2014, approximately six weeks after the final hearing, Dr. Mafa filed a request for designation of an extra-county judge pursuant to Shelby County Circuit Court Local Rule 21. Local Rule 21 provides:

> In any action in which a Shelby County attorney is a real, rather than a nominal party, the parties must file a written notice of that fact with the Court within thirty (30) days after the first responsive pleading in Circuit Court, or the docketing of the case in Circuit Court (whichever is sooner). The written notice must include: a description of the nature of the case, whether a jury has been demanded, and whether or not the attorney-party intends to testify. The Court will then forthwith decide whether or not to request that a Judge from outside Shelby County be designated to hear the case, and will notify counsel for the parties of the decision. Nothing herein shall prevent counsel for either party from requesting that the Court obtain designation of an extra-county judge.

Tenn. R. 30th Dist. Cir. Ct. Rule 21. Here, counsel did not request designation of an extra-county judge until six weeks after the trial court had held a two-day hearing and ruled against her client. The local rule clearly states that upon request, the trial court will ultimately decide whether or not to request the designation of an extra-county judge and will notify the parties of its decision. In other words, designation of an extra-county

16

judge is not mandatory on demand of a party. We discern no reversible error with regard to this issue due to the late timing of Dr. Mafa's request.

### C. Service of the Petition for Order of Protection

Dr. Mafa also contends that reversal is required due to Ms. Purifoy's failure to comply with the provisions of Tennessee Code Annotated section 36-3-605 regarding service of the petition for order of protection. The statute provides, in pertinent part:

> (a) Upon the filing of a petition under this part, the courts may immediately, for good cause shown, issue an ex parte order of protection. An immediate and present danger of abuse to the petitioner shall constitute good cause for purposes of this section.
>
> (b) Within fifteen (15) days of service of such order on the respondent under this part, a hearing shall be held . . . .
>
> (c) *The court shall cause a copy of the petition and notice of the date set for the hearing on such petition, as well as a copy of any ex parte order of protection, to be served upon the respondent* at least five (5) days prior to such hearing. An ex parte order issued pursuant to this part shall be personally served upon the respondent. . . .

Tenn. Code Ann. § 36-3-605 (emphasis added). Here, Ms. Purifoy filed her petition for order of protection on February 26, 2014, after Dr. Mafa was allegedly seen in the employee parking lot outside the Family Safety Center. On the same day the petition was filed, the circuit court entered an ex parte order of protection pursuant to Tennessee Code Annotated section 36-3-605(a) upon finding that Ms. Purifoy was under an immediate and present danger of abuse. The ex parte order of protection provided that a hearing would be held two days later on February 28, 2014.[15] A hearing was held on February 28, and Dr. Mafa appeared with his counsel. Although we do not have a transcript, Judge McCarroll's written order entered that day states that "[t]he Petition for Order of Protection, [and] Ex Parte Order of Protection . . . were filed by Plaintiff and hand-delivered to <u>Defendant Devine Mafa/Defendant's Attorney (circle)</u> in court on February 28, 2014 at 11 AM." Dr. Mafa later filed a response to the petition for order of protection reciting that "[o]n February 28, 2014, Mafa was officially served an Ex Parte Order of Protection, while in Court." At the final hearing, Dr. Mafa's attorney stated that Dr. Mafa "was served with a notice of a hearing for an order of protection" in court on February 28. Dr. Mafa also testified that when he appeared in court on February 28,

---

[15]It appears that the ex parte order of protection was sent to a private process server by the circuit court on February 26, but there is nothing in the record to indicate whether the service was successful.

"that's when I was first served." In Dr. Mafa's post-trial motion to alter or amend, he stated, "Mr. Mafa was personally served outside of court with his lawyer present on February 28, 2014." Considering all of these statements in the record, we find no merit in Dr. Mafa's assertion on appeal that he was never served with the petition for order of protection.

Dr. Mafa appears to argue, perhaps alternatively, that "[t]he ex parte orders of protection served upon Dr. Mafa" that erroneously listed the docket number for the defamation case "did not comply with the service requirements of the statute." Again, this argument has no merit. Dr. Mafa was served with the petition for order of protection and the February 28 ex parte order of protection, which both listed the correct docket number. We recognize that Dr. Mafa's response to the petition for order of protection and some later ex parte orders of protection incorrectly listed the docket number for the defamation case. However, the trial court entered an order correcting the record, which placed those original documents in the correct file for the order of protection case rather than the defamation case. The trial court found that the substance of the documents was not affected by the erroneous numbering, and we agree. When Dr. Mafa was served with the various ex parte orders of protection, he knew that they were entered in the context of the case involving the petition for an order of protection because he proceeded accordingly, and no one challenged the incorrect numbering until after the final hearing. Therefore, Dr. Mafa is not entitled to relief based on this technicality regarding the docket numbers.

### D.    Stalking

Dr. Mafa also argues that the trial court erred in finding that he stalked Ms. Purifoy. Again, the trial court concluded that Dr. Mafa was stalking Ms. Purifoy and that her fear of him was reasonable due to his actions. The court found that Ms. Purifoy viewed the videos that Dr. Mafa posted about her and was scared of him as a result. The court found that Ms. Purifoy had "a right to be afraid" due to Dr. Mafa's video "rant at her" in which he called her by name. The court found that Dr. Mafa also posted pictures of Ms. Purifoy on his Facebook page multiple times, and on these posts, he referred to himself as the Messiah, which caused her reasonable fear. The court found that Ms. Purifoy was terrified and disturbed by the side-by-side photographs Dr. Mafa posted of Ms. Purifoy next to his ex-girlfriend. The court noted Dr. Mafa's statement in his posts that he had stared at Ms. Purifoy's picture for hours. The trial court found that Dr. Mafa's Facebook posts were "part of his stalking." Although the court found no proof to establish that Dr. Mafa knew that Ms. Purifoy worked at the Family Safety Center when he went there the first time, the court found that he was seen in the employee parking lot of the Family Safety Center on a subsequent occasion in February 2014. The court found that Dr. Mafa also sent a message to Ms. Purifoy during this proceeding stating that he

had hired a private investigator and that she could lose her law license, which, the court found, "can't be called anything but harassment or intimidation."

On appeal, Dr. Mafa argues that the Facebook videos he posted on his own Facebook page do not constitute "contact" within the meaning of the statutory definition of stalking. He argues that his videos or postings cannot constitute contact because they were never posted on Ms. Purifoy's Facebook page. We disagree. Pursuant to the relevant statutes, a "'[s]talking victim' means any person, regardless of the relationship with the perpetrator, who has been subjected to, threatened with, or placed in fear of the offense of stalking, as defined in § 39-17-315[.]" Tenn. Code Ann. § 36-3-601(11). In turn, the offense of "stalking" is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Tenn. Code Ann. § 39-17-315(a)(4).[16] At the time of the acts and proceedings below, the statute defined a "course of conduct" as "a pattern of conduct composed of a series of two (2) or more separate noncontinuous acts evidencing a continuity of purpose." Tenn. Code Ann. § 39-17-315(a)(1) (2014).[17] "'Harassment' means conduct directed toward a victim that includes, *but is not limited to*, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress." Tenn. Code Ann. § 39-17-315(a)(3) (emphasis added). At the time of the acts and proceedings below, the statute further defined "unconsented contact" as:

> any contact with another person that is initiated or continued without that person's consent, or in disregard of that person's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is

---

[16]The statute further provides, in subsection (f):

> In a prosecution for a violation of this section, evidence that the defendant continued to engage in a course of conduct involving repeated unconsented contact with the victim after having been requested by the victim to discontinue the conduct or a different form of unconsented contact, and to refrain from any further unconsented contact with the victim, is prima facie evidence that the continuation of the course of conduct caused the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

Tenn. Code Ann. § 39-17-315(f).

[17]Effective July 1, 2016, the stalking statute was amended to provide that a course of conduct is a pattern of conduct of two or more noncontinuous acts evidencing a continuity of purpose "including, but not limited to, acts in which the defendant directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to a person, or interferes with a person's property[.]" Tenn. Code Ann. § 39-17-315(a)(1) (2016).

not limited to, any of the following:

(A) Following or appearing within the sight of that person;

(B) Approaching or confronting that person in a public place or on private property;

(C) Appearing at that person's workplace or residence;

(D) Entering onto or remaining on property owned, leased, or occupied by that person;

(E) Contacting that person by telephone;

(F) Sending mail or electronic communications to that person;[18] or

(G) Placing an object on, or delivering an object to, property owned, leased, or occupied by that person[.]

Tenn. Code Ann. § 39-17-315(a)(3). We conclude that Dr. Mafa's Facebook "rants" to Ms. Purifoy fall within the definition of "unconsented contact," in the form of "electronic communications" to her that were initiated without her consent and continued in disregard of her expressed desire that the contact be discontinued. In his video posts, Dr. Mafa spoke *directly to* Ms. Purifoy, stating things like,

> For you as a black woman, you should know better. You should have your mind checked out. You should know that you don't do that. . . . [Y]ou are a shame. Shayla Nicole, you are a shame. You should be ashamed of yourself. Anyway, I had to rant to you a little bit . . . .
> . . . . You should be ashamed of yourself, Shayla Nicole. I didn't know your name then. I know it now.

In another instance, he spoke about seeing Ms. Purifoy at a bar and said "I saw you." In another, he mentioned, "you'll be held responsible." Dr. Mafa's posts were publicly available, and Ms. Purifoy viewed them, as Dr. Mafa intended. It does not matter that Dr. Mafa posted the messages publicly *to his own page* rather than on Ms. Purifoy's page. The fact remains that it was "unconsented contact" within the meaning of the statute.

Although the statutory definition of "stalking" varies from state to state, electronic communication like that occurring in this case has been held to qualify as contact or communication. *See, e.g., Commonwealth v. C.M.D.*, 91 Mass. App. Ct. 1111, 2017 WL 958462, at *1 (Mar. 13, 2017) (concluding that "postings on the defendant's own

---

[18] At the time of the acts and proceedings below, the statute provided that "unconsented contact" included "[s]ending mail or electronic communications to that person." Tenn. Code Ann. § 39-17-315(a)(5)(F) (2014). Effective July 1, 2016, the statute was amended to specifically include within the definition of stalking "[s]ending to that person mail or any electronic communications, including, but not limited to, electronic mail, text messages, or any other type of electronic message sent using the Internet, web sites, or a social media platform." Tenn. Code Ann. § 39-17-315(a)(5)(F) (2016).

Facebook page" were "electronic communication" within the meaning of the stalking statute); *Shaw v. Young*, 199 So. 3d 1180, 1189 (La. Ct. App. 2016) (finding that postings to the defendant's own public Facebook page were "electronic communications" within the meaning of the cyberstalking statute and also observing that there was no reason for such posts "other than to communicate them to [the victim] or to other Facebook users, who then might convey the messages to [the victim]"); *State v. Craig*, 112 A.3d 559, 566 (N.H. 2015) (affirming conviction for stalking based on a series of messages posted on the defendant's own Facebook profile that were directed to the victim and specifically rejecting the defendant's argument that "his Facebook posts cannot constitute contact because he merely posted publicly online without sending the posts directly to the victim"); *see also* Ashley N. B. Beagle, *Modern Stalking Laws: A Survey of State Anti-Stalking Statutes Considering Modern Mediums and Constitutional Challenges*, 14 Chap. L. Rev. 457, 458 (2011) (observing that "technology continues to increase and expand the ways in which stalkers can stalk and harass their victims").

Next, Dr. Mafa argues that his appearance in the employee parking lot of the Family Safety Center in February 2014 cannot constitute contact within the meaning of the definition of stalking. He notes that Ms. Purifoy's twin sister was present in the parking lot, not Ms. Purifoy, and that she simply got in her car and drove away. However, the stalking statute provides that "unconsented contact" includes "[a]ppearing at that person's workplace[.]" Tenn. Code Ann. § 39-17-315(a)(5)(C). Accordingly, we conclude that this act can be considered as another instance of unconsented contact within the meaning of the statute, even though he did not have a direct encounter with Ms. Purifoy on this occasion. *See, e.g.*, Tenn. Code Ann. § 39-17-315(a)(5) (providing that unconsented contact would also include entering onto property owned by the person or placing an object on property owned by the person).

Next, Dr. Mafa argues that his actions did not cause Ms. Purifoy "emotional distress" as required by the definition of "harassment," as it relates to "stalking." *See* Tenn. Code Ann. § 39-17-315. The stalking statute defines "emotional distress" as "significant mental suffering or distress" but adds that professional treatment or counseling is not necessarily required. Tenn. Code Ann. § 39-17-315(a)(2). At the final hearing, Ms. Purifoy testified that she became concerned by the level of attention that Dr. Mafa attributed to her in December and January 2014 and felt that Dr. Mafa had "become obsessed" with her. She testified, "It was scary to me." She described his postings as "creepy" and said she did not know why he suddenly showed renewed interest in her nearly a year after her trial testimony. Ms. Purifoy said, "I considered what he was doing threatening." Ms. Purifoy explained that in the videos, Dr. Mafa was looking directly into the camera and calling her name in a manner that she interpreted as yelling. She noted that he not only referenced what happened in court but also made repeated and continued references to her appearance, even describing the angles of her face and stating

21

that he had stared at her picture for hours. She was concerned by the pictures of herself placed next to Dr. Mafa's ex-girlfriend. Ms. Purifoy testified that she did not know what Dr. Mafa "might be capable of." Ms. Purifoy explained that she initially sought an injunction requiring Dr. Mafa to stay away from her. However, when she learned about Dr. Mafa being present in the employee parking lot of her place of employment, she became alarmed and afraid. She explained that when "all of that came together" with the various postings and his appearance at the Family Safety Center, she decided she also needed to seek an order of protection. Considering this testimony, we conclude that Dr. Mafa's unconsented contact caused Ms. Purifoy to subjectively experience significant distress within the meaning of the statute.

Finally, Dr. Mafa argues this his Facebook postings were merely "ranting" and that they are constitutionally protected free speech. He notes that the statutory definition of harassment "does not include constitutionally protected activity or conduct that serves a legitimate purpose." Tenn. Code Ann. § 39-17-315(a)(3).

"[T]he right of free speech is not absolute at all times and under all circumstances." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571 (1942). "'[A]ll basic rights of free speech are subject to reasonable regulation.'" *State v. Smoky Mountain Secrets, Inc.*, 937 S.W.2d 905, 910 (Tenn. 1996) (quoting *H & L Messengers, Inc. v. City of Brentwood*, 577 S.W.2d 444, 451 (Tenn. 1979)). In addition, "[s]peech integral to criminal conduct is not protected." *State v. Mitchell*, 343 S.W.3d 381, 394 (Tenn. 2011) (citing *U.S. v. Stevens*, 559 U.S. 460 (2010)). The "prevention and punishment" of speech integral to criminal conduct has "never been thought to raise any Constitutional problem." *U.S. v. Stevens*, 559 U.S. at 468-69 (quotation omitted).

"[F]ree speech does not include the right to cause substantial emotional distress by harassment or intimidation." *State v. Cooney*, 894 P.2d 303, 307 (Mont. 1995); *see also Erickson v. Earley*, 878 N.W.2d 631, 635 (S.D. 2016) ("freedom of expression does not include threatening or harassing conduct"). "While stalking does contain an element of speech, that speech does not fall within the protections of the first amendment." *McNally v. Bredemann*, 30 N.E.3d 557, 563 (Ill. Ct. App. 2015). Words concerning surveilling or harassing a person to intimidate are not entitled to protection as free speech. *Id.* In stalking cases, the "defendant's right to free speech is permissibly subordinated to the complainant's right to be free of repetitive, unwanted verbal and non-verbal communications which are likely to instill in the complainant a reasonable fear of harm." *People v. Carboy*, 955 N.Y.S.2d 473 (N.Y. Sup. Ct. 2012) (quotation omitted).

> While the right to free speech guarantees a powerful right to express oneself, it does not include the right to repeatedly invade another person's constitutional rights of privacy and the pursuit of happiness through the use

of acts and threats that evidence a pattern of harassment designed to inflict substantial emotional distress.

*People v. Borrelli*, 77 Cal. App. 4th 703, 716, 91 Cal. Rptr. 2d 851, 860 (2000). Stalking statutes do not regulate the *content* of speech inasmuch as the *manner* in which the communication is made (i.e., here, through repeated unconsented contact reasonably causing the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested). *See Borelli*, 77 Cal. App. 4th at 716.

Here, Dr. Mafa's repeated video and written postings to and about Ms. Purifoy were part of his course of conduct of stalking. His repeated posts were clearly meant to harass, degrade, intimidate, threaten, and humiliate Ms. Purifoy, and they had the desired effect of causing her fear and emotional distress. This was not protected free speech that was exempt from the stalking statute's definition of harassment.

### E.    Due Process

On appeal, Dr. Mafa asserts that he was "denied due process" for several reasons. However, his precise arguments regarding "due process" are difficult to determine from his brief. His brief on appeal lists as a separate issue, "Was Dr. Mafa Denied Due Process?" Aside from the apparent vagueness of this issue, his brief fails to properly develop a legal argument with supporting authority regarding due process. His brief includes a lengthy section entitled, "Dr. Mafa Was Denied Due Process." Immediately underneath this broad heading, however, he simply includes five subsections addressing some of the issues that he listed separately in his brief (*e.g.*, his post-trial request for extra-county judge; and service of the petition for order of protection) and other issues that were not listed separately in his brief (*e.g.*, validity of service in the defamation case; timeliness of the hearing; denial of access to the Family Safety Center; and right to a jury trial). This "due process" section of his brief spans a total of seventeen pages, but the only legal authority he cites *about due process* is the due process clause itself, which he quotes on one page. (We note one limited exception to this statement, regarding the subsection addressing the Family Safety Center, which we will explain hereinafter.)

"It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). "[P]arties must thoroughly brief the issues they expect the appellate courts to consider." *Waters v. Farr*, 291 S.W.3d 873, 919 (Tenn. 2009). Having carefully reviewed Dr. Mafa's brief on appeal in light of the voluminous record, we conclude that he has waived any issue on appeal regarding the violation of his due process rights for

23

failure to construct an appropriate argument in his brief. We will proceed to consider the substantive legal arguments contained within the five subsections regarding alleged violations of the Tennessee Rules of Civil Procedure and various statutes, but we will not address whether Dr. Mafa's due process rights were violated in connection with those subsections (with the exception of his issue regarding the Family Safety Center).

### 1. Family Safety Center

Dr. Mafa argues that he was denied due process when Ms. Purifoy "used her position with Memphis Area Legal Services" to unconstitutionally deny him access to a public building, the Family Safety Center, to file an order of protection against her. He claims that the posting of his photographs at the behest of Ms. Purifoy interfered with his right to access the courts to file his own petition for order of protection and also interfered with "his liberty protected by the due process clause." He claims that the denial of his right to enter the Family Safety Center violated his constitutional rights "and merits a reversal." In response, Ms. Purifoy argues that no due process violation occurred because Dr. Mafa was still able to seek an order of protection, and he was given a full hearing on his petition.

Dr. Mafa does cite some limited legal authority to support this argument, as his brief states, "*See Kennedy v. City of Cincinnatti, 595 F.3d 327[] **19 (6th Cir. 2010)* (there is a liberty interest to remain in a public place of one's choice); *Williams v. Fears, 179 U.S. 270, 274 (1900); Papachristou v. Jacksonville, 405 U.S. 156, 164(1972)[]; Kent v. Dulles, 357 U.S. 116, 126 (1958))*." However, Dr. Mafa does not cite to any location in the voluminous record to indicate that he properly raised this constitutional issue or claim in the trial court, and the trial court made no ruling regarding this issue for us to review. As a court of appeals, "we are limited in authority to the adjudication of issues that are *presented and decided* in the trial courts." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31-32 (Tenn. 2001). This constitutional issue was neither presented nor decided in the court below. Alternatively, however, we also conclude that Dr. Mafa has not demonstrated that his inability to enter the Family Safety Center entitles him to a reversal of the order entered in this case after a full hearing.[19]

---

[19]In the section of his reply brief addressing this issue about the Family Safety Center, Dr. Mafa states that his counter-petition for an order of protection "is on appeal as well in this case," and he asks this Court to reverse the trial court's order dismissing his counter-petition and to grant him an order of protection. However, issues cannot be raised for the first time in a reply brief. *See Owens v. Owens*, 241 S.W.3d 478, 499 (Tenn. Ct. App. 2007) ("A reply brief is a response to the arguments of the appellee. It is not a vehicle for raising new issues.").

## 2.    The Injunction in the Defamation Case

In another subsection, Dr. Mafa alleges that the trial court "improperly relied in part" on the entry of the permanent injunction in the defamation case. Dr. Mafa argues on appeal that he was never served with the complaint in the defamation case and that he did not have notice of the injunction hearing before the permanent injunction was issued, and therefore, the trial court erred by referencing the injunction in its decision in this case.[20] Dr. Mafa asks this Court to consider the record from the defamation case, which was included in the appellate record on appeal pursuant to the parties' stipulation order, and to determine whether service was properly accomplished in the defamation case pursuant to the Tennessee Rules of Civil Procedure. He claims that no personal service was accomplished, and therefore, the permanent injunction should be held void, and the defamation case should be dismissed.[21]

We decline to extend our review on appeal to the lengths urged by Dr. Mafa. It is important to keep in mind that *this appeal* arises out of the parties' order of protection case. Regardless of the fact that the parties entered into a stipulation order designating all documents from the defamation case to be included in this record, we must bear in mind that this Court dismissed Dr. Mafa's separate appeal from the defamation case due to the lack of a final judgment. Here, we are concerned with the issues raised and errors allegedly committed by the trial court in the context of the order of protection case.

At the final hearing, Dr. Mafa testified that he first learned about the injunction entered in the defamation case on January 23, 2014, when he went to the Family Safety Center to obtain an order of protection against Ms. Purifoy based on the alleged assault at the Silly Goose bar on New Year's Eve. He testified that security personnel would not allow him to enter and that they informed him that a lawsuit had been filed and a court order had been entered against him. Dr. Mafa said he contacted his lawyer, and upon investigation, they learned of the entry of the injunction. He filed his motion to set aside

---

[20]As previously noted, the permanent injunction entered on January 13, 2014, referenced "testimony of Plaintiff's attorney that notice was sent to Defendant via certified mail and attempts were made via the Sheriff's Office, a private process server, and Defendant [h]as indicated through his own communications that he is aware of this filing (see attachment)." Dr. Mafa later filed a motion to set aside the injunction order due to lack of service, but his motion sought reinstatement of the temporary injunction rather than dismissal. Before the trial court, Dr. Mafa admitted that he was served with "the injunction" in court on February 28, but he claimed that he was never served with "the original injunction paperwork," presumably referring to the defamation complaint. However, Ms. Purifoy testified at the final hearing in this case that Dr. Mafa was served with the defamation complaint on February 28 at court.

[21]To illustrate our earlier point, we note that Dr. Mafa's brief on appeal does not contain any "due process" analysis with regard to this issue. After discussing several cases and rules regarding service of process, he simply asserts, "Because of [Ms.] Purifoy's failure to comply with the Tennessee Rules of Civil Procedure, the Appellant has been denied due process."

the injunction on February 12, 2014. Dr. Mafa testified that he never returned to the Family Safety Center, but Ms. Purifoy's twin sister testified that she saw him in the parking lot after hours on February 20, 2014.

In its order granting Ms. Purifoy's petition for order of protection, the trial court found that the injunction requested by Ms. Purifoy in the defamation case was granted in January 2014 and that Dr. Mafa admittedly became aware of the injunction on January 23, 2014, when he went to the Family Safety Center and was denied entry by security. The court noted Ms. Purifoy's position that Dr. Mafa was "aware of the injunction and in spite of that [] he came about her workplace." The trial court found that Dr. Mafa was in fact spotted in the parking lot of the Family Safety Center in February 2014, after the injunction was granted. However, we cannot agree with Dr. Mafa's assertion that these findings warrant reversal.

The issue before the Court *in this case* was whether Dr. Mafa engaged in a willful course of conduct involving repeated or continuing harassment that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually caused Ms. Purifoy to feel terrorized, frightened, intimidated, threatened, harassed, or molested. *See* Tenn. Code Ann. § 39-17-315(a)(4). The trial court found that he did, in part because he appeared at Ms. Purifoy's workplace even after he was denied entry once and notified of the defamation suit and the entry of the injunction against him. Dr. Mafa's arguments regarding service in the defamation case do not negate the fact that he appeared at her workplace as part of a willful course of conduct involving continuing harassment within the meaning of the stalking statute. In other words, his appearance at her workplace was unconsented contact regardless of whether it also violated an injunction in a separate case. We find no basis for reversal of the order of protection based on this issue.

### 3. Timeliness of the Hearing

Next, Dr. Mafa complains about the fact that the petition for an order of protection was filed on February 26, 2014, and the final hearing did not commence until October 27, 2014. He cites Tennessee Code Annotated section 36-3-605, which provides, in relevant part:

> (a) Upon the filing of a petition under this part, the courts may immediately, for good cause shown, issue an ex parte order of protection. . . .

> (b) *Within fifteen (15) days of service of such order on the respondent* under this part, *a hearing shall be held*, at which time the court shall either

26

dissolve any ex parte order that has been issued, or shall, if the petitioner has proved the allegation of domestic abuse, stalking or sexual assault by a preponderance of the evidence, extend the order of protection for a definite period of time . . . .

(Emphasis added.) Because of the delay in this case, Dr. Mafa contends that the order of protection ultimately entered against him must be reversed.

On appeal, Ms. Purifoy argues that Dr. Mafa waived his right to complain about the delay because Dr. Mafa or his counsel sought every continuance entered by the court, with the exception of one occasion, when Ms. Purifoy did not subpoena her witnesses due to the withdrawal of Dr. Mafa's attorney. Unfortunately, the record on appeal simply does not reveal the reason for *most* of the continuances entered in this case. After the petition was filed on February 26, 2014, Judge Karen Williams signed the initial ex parte order of protection. A hearing was held just two days later, on February 28, and Dr. Mafa was present with his counsel. Judge Williams entered an order transferring the matter to another division due to the pending defamation suit there, and the hearing was continued until April 4, 2014, to be heard at the same time as a motion previously filed in the pending defamation suit. Judge McCarroll entered a second ex parte order of protection after the hearing on February 28. The pre-printed order of protection form used by the court states that "You must obey these orders until the date of the hearing or until changes are made by the court."[22] However, the record contains no indication as to whether Dr. Mafa consented or objected to this initial continuance.

However, the order entered at the next hearing, on April 4, states that the petition for order of protection came before the court and the matter was "continued at the request of Defendant to 5/30/14[.]" The order of continuance provided that the ex parte order of protection would remain in place, but a third ex parte order of protection was entered that day. On May 30, another ex parte order was entered, without explanation, directing Dr. Mafa to appear for a hearing on July 17. The petition for order of protection was finally heard before Judge McCarroll on July 17 and 18, but Dr. Mafa requested recusal of Judge McCarroll when the executive director for Memphis Area Legal Services was called to testify as the last witness. As a result, on July 18, 2014, Judge Higgins entered yet another ex parte order of protection by interchange directing Dr. Mafa to return to court on August 29. On August 29, Judge Fields entered an ex parte order of protection requiring the parties to return to court on September 26, 2014. Dr. Mafa's attorney moved to withdraw shortly before the hearing, and Judge Fields granted that request at the beginning of the September 26 hearing. Judge Fields advised the parties that she

---

[22]Tennessee Code Annotated section 36-3-604 directs the administrative office of the courts to develop an ex parte order of protection form and provides, "These forms shall be used exclusively in all courts exercising jurisdiction over orders of protection." Tenn. Code Ann. § 36-3-604(b), (d).

intended to hold the final hearing within fifteen days, but the attorney who was withdrawing from representing Dr. Mafa indicated that Judge Fields' plan presented a problem for Dr. Mafa due to his attorney's withdrawal. Judge Fields directed Dr. Mafa to obtain a new attorney as soon as possible and prepare for the final hearing on October 13, insisting, "This thing is going forward on the 13th." On October 7, however, Dr. Mafa filed a motion to continue the final hearing for thirty to ninety days to enable him to retain an attorney and conduct discovery. A hearing was held on October 10, 2014, but it was erroneously set on the motion docket, so the case was continued again until October 27. The trial court entered another ex parte order of protection in the meantime. In a motion to recuse that Dr. Mafa filed on October 10, 2014, Dr. Mafa complained, among other things, that Judge Fields "wants to rush the trial" without allowing Dr. Mafa to obtain discovery. The final hearing commenced on October 27, as set by Judge Fields, without the thirty to ninety day continuance requested by Dr. Mafa.

Obviously, the proceedings in this case were convoluted and not a model for practice. On the other hand, however, Dr. Mafa clearly substantially contributed to the delay by requesting continuances, and he even sought an additional continuance of up to 90 days just before the final hearing. Accordingly, we find it somewhat disingenuous for Dr. Mafa to now complain about the trial court's delay in holding the final hearing.

The Tennessee Supreme Court considered the order of protection statute's time requirements for such hearings in *Kite v. Kite*, 22 S.W.3d 803 (Tenn. 1997). In that case, an ex parte order of protection was entered on December 27, 1995, it was served on the respondent on December 29, and the hearing date was set for January 22, 1996. *Id.* at 804. At that time, Tennessee Code Annotated section 36-3-605 required a hearing date within ten days of service of an ex parte order of protection. *Id.* The hearing in *Kite* was held outside the ten-day window. *Id.* The respondent argued that he was entitled to dismissal of the action against him because the trial court only retained jurisdiction for ten days following service of the ex parte order of protection. *Id.* The court of appeals agreed, but the supreme court reversed the dismissal. The supreme court held that the legislature intended the ten-day hearing requirement only as a limit on the duration of the ex parte protective orders. *Id.* The court explained:

> Victims of domestic violence may seek judicial protection pursuant to Tenn. Code Ann. § 36-3-601 et seq. ("Act"). Protection may be initiated by filing a standard form petition under this Act. Tenn. Code Ann. § 36-3-604 (1990 Repl.). The form petition, as used in this case, requests a hearing and, if appropriate, an ex parte protective order. A trial court may issue ex parte relief upon a finding of good cause. Tenn. Code Ann. § 36-3-605 (1990 Repl.). A hearing shall be conducted whether or not ex parte relief is granted. At the time of the hearing, the trial court may issue a protective

28

order "for a definite period of time, not to exceed one (1) year." *Id.*

The issue in this controversy concerns the statutory language mandating a hearing within ten days of service of an ex parte protective order. . . .

This appeal focuses on the legislature's intent in drafting the ten-day hearing requirement.

*Id*. at 804-05. The court found the intended operation of the hearing requirement ambiguous, as the statute mandated a hearing within ten days but did not clearly define the ramifications of failing to conduct a hearing within the prescribed time. *Id.* at 805. As a result, the court looked to the statutory scheme to determine the legislative intent. *Id.* The court concluded that the legislature intended to provide enhanced protection to victims of abuse and communicate a position of intolerance to the perpetrators. *Id.* The court concluded that the respondent's position regarding the mandatory time limit would procedurally bar a victim's access to judicial protection even if a hearing was requested within ten days, and without fault of the petitioner, the hearing was not conducted within the prescribed timeframe. *Id.* The court considered this "an absurdity." *Id.* The court explained:

> We shall interpret the legislature's intention of the ten-day requirement consistent with their stated policy of providing enhanced protection. While the statute mandates a hearing within ten days, the statute also provides that the ex parte order will remain in effect "until the time of the hearing." Tenn. Code Ann. § 36-3-605(b). Construing this language "in pari materia," we find that *the ten-day requirement modifies or refers solely to the ex parte order* and not the trial court's jurisdiction. The legislature apparently inserted this requirement to insure a prompt hearing to determine the validity and necessity of the ex parte relief. *When a trial court fails to set a hearing within ten days, the ex parte order expires* and the case assumes the posture of a case where no ex parte order of protection has been issued.
>
> We think the legislature neither envisioned nor intended the prompt hearing requirement to bar procedurally a domestic abuse victim's access to judicial protection. The prompt hearing requirement limits the potential for abuse by protecting respondents from possible ongoing frivolous or retaliatory ex parte protective orders. The ten day hearing requirement is, therefore, *merely a limitation on the duration of an ex parte protective order*. Had the legislature intended a complete procedural bar, it could have specifically drafted one. Barring a petitioner's access to judicial protection when a trial court fails to conduct a hearing within the prescribed time runs counter to the legislature's stated policy of providing enhanced

29

protection.

We acknowledge that requiring expedited hearings may present challenges to trial courts experiencing crowded dockets. Despite limited resources, we believe the judicial system is capable of meeting the challenge and complying with the legislative directive.[23] *A trial court's noncompliance, however, should not deprive the domestic abuse victim of access to judicial protection.*

*Id.* at 806 (emphasis added).

From the *Kite* decision, we see that the circuit court did not lose jurisdiction to rule on the petition for order of protection due to its failure to comply with the fifteen-day hearing requirement. We reject Dr. Mafa's position that he is now entitled to reversal and dismissal of the order of protection ultimately entered against him based solely on the trial court's delay, to which he substantially contributed in part. The trial court's noncompliance should not deprive Ms. Purifoy of access to judicial protection. *Kite*, 22 S.W.3d at 806; *see also Jackson v. Lanphere*, No. M2010-01401-COA-R3-CV, 2011 WL 3566978, at *4 (Tenn. Ct. App. Aug. 12, 2011) (finding no reversible error when the trial court continued a hearing on an ex parte order of protection for it to be heard by another judge beyond the 15-day period, as "the chancery court retained jurisdiction to hear [the] order of protection petition after the 15-day period had passed and was not required to hold the hearing on [the originally scheduled date]").

### 4.    Jury Trial

Next, Dr. Mafa asserts that he was denied "his right to a jury trial." This argument has no merit, however, as this Court has previously held that "there is no right to a jury trial prior to the issuance of an order of protection." *Clark v. Crow*, 37 S.W.3d 919, 920 (Tenn. Ct. App. 2000). In *Clark*, we explained that there is no constitutional right to trial by a jury in these matters, and the Domestic Abuse Act, Tenn. Code Ann. § 36-3-601, et seq., provides no statutory right to a jury trial. *Id.* at 921. Accordingly, Dr. Mafa had no right to a jury trial.

### F.    *Rules of Evidence*

Dr. Mafa frames his next issue as follows: "Was evidence admitted contrary to the Rules of Evidence which prejudiced and tainted the proceedings as to Dr. Mafa." The argument section of his brief addresses this issue by stating,

---

[23]The court noted that "[t]rial courts unable to set hearings within the statutorily mandated time may need to rely on transfer, interchange or other judicial means to have cases heard." *Id.* at 806 n.4.

30

It is undisputed that the videos made exhibits to the hearing cut off and are incomplete, and therefore violate the rule of completeness, Tenn. R. Evid. 106. Objections were also made on the basis of hearsay, Vol.15, 65: 11-2; failure to lay a proper foundation and lack of authenticity. Vol. 15, 67: 20-23; 70: 17-21; 71: 6-8. For that reason they should not have been considered by the Court.

He also adds that the Facebook postings "were not properly authenticated under Tenn. R. Civ. P. 901, and also constituted inadmissible hearsay under 802" and were "prejudicial in violation of Tenn. R. Evid. 402." Once again, these are nothing more than skeletal arguments, and we deem these issues waived.

### G. Dr. Mafa's "Settlement Demand Email"

Dr. Mafa's next issue pertains to the email he sent to Ms. Purifoy's counsel the night before the Friday, October 24, 2014 hearing, regarding the private investigator. We deem it appropriate to recite the terms of the email here:

Re: Final Request

Dear Attorney McAfee,

I am writing you in regards to the above referenced matter. I hired a private investigator to conduct extensive research on you and your client. As a result, he provided me with some very incriminating evidence on your client's part. According to the findings, it is inconclusive as to the exact role you have played in Ms. Purifoy's abuse of process and extortion plot.

I am giving you until the close of business on Friday to voluntarily non-suit this case because it was not filed in good faith and Ms. Purifoy did not serve the initial complaint in which you illegally obtained an injunction against me. I was not aware of the complaint and you know this to be a undisputed fact.

On several occasions, Ms. Purifoy even signed your name on several of the pleadings which contain blatant lies, that will be proven. I intend to reveal this investigation along with all communications, documents, and affidavits to the proper agency's and authorities if your client insist[s] on proceeding with this charade.

It would be in everyone's best interest to voluntarily non-suit this matter

31

immediately. I have suffered tremendously from her abuse of process.

Please consider this email a formal notice and understand, as a licensed attorney you, have a duty to give Ms. Purifoy this demand. I can assure you that she does not want to risk losing her law license for this frivolous case that was not filed in good faith.

Sincerely,
Dr. Mafa

The trial court found that this message was yet another threat to Ms. Purifoy regarding her law license and "can't be called anything but harassment or intimidation."

On appeal, Dr. Mafa acknowledges that this message was a demand that Ms. Purifoy "drop the matter" or else be reported to the Board of Professional Responsibility. However, he asserts that this was "a confidential settlement communication" that was privileged and inadmissible pursuant to Tennessee Rule of Evidence 408, which provides:

Evidence of (1) furnishing or offering to furnish or (2) accepting or offering to accept a valuable consideration in compromising or attempting to compromise a claim, whether in the present litigation or related litigation, which claim was disputed or was reasonably expected to be disputed as to either validity or amount, is not admissible to prove liability for or invalidity of a civil claim or its amount or a criminal charge or its punishment. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence actually obtained during discovery merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution; however, a party may not be impeached by a prior inconsistent statement made in compromise negotiations.

Tenn. R. Evid. 408. We agree with the trial court's conclusion that Dr. Mafa's demand does not constitute an offer to compromise in the context of a settlement negotiation. Furthermore, the message was not introduced "to prove liability" for a claim or charge. It was offered for another purpose – to demonstrate continued harassment and intimidation of Ms. Purifoy within the meaning of the stalking statute.

At trial, Dr. Mafa backtracked on the language used in his demand and testified that he did not in fact hire a private investigator to follow Ms. Purifoy. Instead, he testified that he simply directed someone to conduct online research about her. On appeal, he argues that he had a valid right to do this in order to prepare for trial. However, the issue is not whether Dr. Mafa had a legitimate right to conduct online research. The issue, once again, is whether he engaged in a course of conduct of continuing harassment and unconsented contact within the meaning of the stalking statute. The trial court found that Dr. Mafa's message was yet another instance of unconsented contact in an attempt to intimidate and threaten her. We cannot say that the trial court erred in this conclusion.

## H.    *Evidence Regarding Police Reports*

At trial, Dr. Mafa was asked how many times other people had complained that he had made harassing and threatening telephone calls to them. Dr. Mafa responded "one, maybe two." Counsel for Ms. Purifoy then asked Dr. Mafa if he wanted to review the file he had obtained containing numerous police incident reports involving Dr. Mafa and various other individuals. The trial court asked about the extent of the file, and counsel said that he had obtained 36 incident reports involving complaints made by and against Dr. Mafa. The trial judge permitted counsel to ask Dr. Mafa about some of these incidents. With regard to each, Dr. Mafa either said that he did not recall the incident or presented his side of the story. The actual incident reports were not entered into evidence. The trial judge directed counsel to stop his questioning after about twenty incidents. Ultimately, the trial court found that Dr. Mafa had "extensive contact with the justice system," demonstrated by at least 21 past incidents involving police reports. The trial judge observed, "Basically, he said all these people made all of this up. Everybody makes up everything against him." The trial judge ultimately concluded that Dr. Mafa "is a man who deals in drama. He's paranoid. He truly believes there's a conspiracy, that everyone's out there to get him."

On appeal, Dr. Mafa argues that "[s]uch impeachment evidence was highly prejudicial, irrelevant to these proceedings and in violation of Tenn. R. Evid. 402, 403, 404, 405 and 608." Again, this skeletal argument is insufficient to lead this Court to analyze all of these simply listed Rules of Evidence.

However, Dr. Mafa also argues that "if the evidence is merely that the plaintiff is a chronic litigant with respect to all sorts [of] claims, the courts consider the slight probative value overborne by the countervailing factors. This evidence they usually exclude." Dr. Mafa cites only *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38 (Tenn. Ct. App. 2013). The full text of the quote from *Brown* actually states:

Concerning the admissibility of evidence pertaining to a party's involvement in other lawsuits, 1 *McCormick On Evidence* § 196 (Kenneth S. Braun ed., 7th ed. 2013) states, in relevant part, that:

> Should a party be permitted to cast doubt on the merits of the claim at bar by demonstrating that an opponent has advanced similar claims or defenses against others in previous litigation? Inescapably, two conflicting goals shape the rules of evidence in this area. Exposing fraudulent claims is important, but so is protecting innocent litigants from unfair prejudice. The easy cases are those in which one of these considerations clearly predominates. If the evidence reveals that a party has made previous, very similar claims and that these claims were fraudulent, then almost universally the evidence will be admissible despite the dangers of distraction and time-consumption with regard to the quality of these other claims, and despite the general prohibition on using evidence of bad character solely to show conduct on a given occasion. At the other pole, if the evidence is merely that the plaintiff is a chronic litigant with respect to all sorts of claims, the courts consider the slight probative value overborne by the countervailing factors. This evidence they usually exclude.

*Id.* at 47 (footnotes omitted).

Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Just "because evidence is prejudicial does not mean the evidence must be excluded as a matter of law." *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000). Excluding otherwise relevant evidence under Rule 403 "'is an extraordinary step that should be used sparingly.'" *White v. Beeks*, 469 S.W.3d 517, 528 (Tenn. 2015) (quoting *Levine v. March*, 266 S.W.3d 426, 439 (Tenn. Ct. App. 2007)).

Here, Dr. Mafa was asked about police reports purporting to show numerous complaints against him for threatening phone calls and harassment, but other complaints involved various other allegations. Overall, we cannot say that the trial court abused its

discretion in allowing counsel for Ms. Purifoy to question Dr. Mafa about his involvement in these incidents. *See State v. Adams*, 405 S.W.3d 641, 658 (Tenn. 2013) (reviewing the trial court's balancing of probative value and unfair prejudice for abuse of discretion). Further, because Dr. Mafa makes no evidentiary arguments other than under *Brown*, he has waived any other evidentiary issues.

## I.    *Sealing the Case & Recording of the Judgment for Attorney's Fees*

During the course of the proceedings, the trial court granted Ms. Purifoy's motion to seal the record in this case. After the final hearing, it partially granted her request for attorney's fees, awarding her $20,000 plus costs (less than her total fee request of $33,000) pursuant to Tennessee Code Annotated section 36-3-617. The order awarding such fees provided: "for which execution may issue." On December 19, 2014, Dr. Mafa filed in the trial court a motion to set aside the award of attorney's fees and a request for the judge to order removal of the judgment from the Shelby County Register's Office. Dr. Mafa alleged that Ms. Purifoy's counsel had filed the order granting attorney's fees "in this sealed case in the Shelby County Register's Office" when the trial court had not yet entered its final order containing factual findings and conclusions of law from the final hearing. The trial court subsequently entered its final order without specifically addressing Dr. Mafa's motion to set aside and remove the order for attorney's fees.

On appeal, Dr. Mafa argues that the order awarding Ms. Purifoy attorney's fees should be removed from the public registry because, even though it does not contain the trial court's factual findings, it reveals that the award was made pursuant to Tennessee Code Annotated section 36-3-617 based on a finding of stalking. He also argues that this Court should unseal the record in the case "so that Dr. Mafa can express his side of the issue."

In Tennessee, "[t]here is a presumption of openness for government records." *Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 864 (Tenn. 2016). The Tennessee Constitution expressly provides that "all courts shall be open." Tenn. Const. Art. I, § 17. Still, the right of access is not absolute, and "[c]ourts have inherent power to seal their records when privacy interests outweigh the public's right to know." *Knoxville News-Sentinel v. Huskey*, 982 S.W.2d 359, 362 n.1 (Tenn. Crim. App. 1998). Every court has "inherent supervisory authority" over its own records and files. *In re Lineweaver*, 343 S.W.3d 401, 413 (Tenn. Ct. App. 2010). Protective orders strike a balance between public and private concerns. *Ballard v. Herzke*, 924 S.W.2d 652, 658 (Tenn. 1996). "Protective orders are intended to offer litigants a measure of privacy, while balancing against this privacy interest the public's right to obtain information concerning judicial proceedings." *Id.* Access may be denied where court files might "become vehicles for improper purposes, such as promoting public scandal or publication

of libelous statements." *In re NHC–Nashville Fire Litig.*, 293 S.W.3d 547, 561 (Tenn. Ct. App. 2008) (quotation omitted).

In the case at bar, Ms. Purifoy sought a protective order sealing the record after Dr. Mafa filed a pro se motion to dismiss making scandalous allegations against her, which have not been repeated for purposes of this opinion. Ms. Purifoy alleged that Dr. Mafa was using his court filings to further harass and defame her. Based on the testimony at the final hearing, the trial court found that Dr. Mafa's petition for an order of protection "was replete with outrageous accusations, unsupported by proof." The trial court found that Dr. Mafa "made shocking allegations" against Ms. Purifoy but that his testimony about such issues was not credible. Considering the nature of the allegations in this case and the trial court's findings, we agree with the trial court's conclusion that an order sealing the record was appropriate in this matter, and the order sealing the record should remain in effect.[24]

We reject Dr. Mafa's argument that Ms. Purifoy impermissibly "broke[] the seal" by filing a copy of the order awarding attorney's fees in the register's office. The seal on the record was not meant to prevent execution on the judgment for attorney's fees. In fact, the order awarding fees specifically provided that "execution may issue" for the award. We decline to order the removal of the judgment from the register's office.

## J. Attorney's Fees on Appeal

Ms. Purifoy filed a motion for attorney's fees on appeal pursuant to Tennessee Code Annotated section 36-3-617. The statute provides for an award of court costs, including attorney's fees, to a stalking victim:

> Notwithstanding any other law to the contrary, no domestic abuse victim, stalking victim or sexual assault victim shall be required to bear the costs, including any court costs, filing fees, litigation taxes or any other costs associated with the filing, issuance, registration, service, dismissal or nonsuit, appeal or enforcement of an ex parte order of protection, order of protection, or a petition for either such order, whether issued inside or outside the state. If the court, after the hearing on the petition, issues or extends an order of protection, all court costs, filing fees, litigation taxes and attorney fees shall be assessed against the respondent.

Tenn. Code Ann. § 36-3-617(a). This statute clearly indicates that no victim shall be

---

[24]Due to the practical difficulties that would arise, we also reject Ms. Purifoy's suggestion that this Court should order the record "unsealed as to the information regarding [Dr. Mafa] but remain[ing] sealed as to information regarding [Ms. Purifoy]."

required to pay the costs, leaving courts "little maneuvering room." *Merriman v. Merriman*, No. E2010-00013-COA-R3-CV, 2010 WL 3767116, at *2 (Tenn. Ct. App. Sept. 28, 2010). Pursuant to the statute, "this Court may grant an award of reasonable attorney's fees and costs incurred in defending the appeal of an issuance or extension of an order of protection." *Walker v. Pawlik*, No. M2013-00861-COA-R3-CV, 2013 WL 5781565, at *5 (Tenn. Ct. App. Oct. 23, 2013). Because we affirm the trial court's entry of the order of protection, we conclude that Ms. Purifoy is entitled to her attorney's fees and costs in defending this appeal. *See, e.g.*, *Honeycutt ex rel Alexander H. v. Honeycutt*, No. M2015-00645-COA-R3-CV, 2016 WL 3662166, at *5 (Tenn. Ct. App. June 30, 2016) (*no perm. app. filed*); *Land v. Casteel*, No. E2010-00593-COA-R3-CV, 2011 WL 808784, at *3 (Tenn. Ct. App. Mar. 8, 2011). We remand for the trial court to determine a reasonable award to Ms. Purifoy for her attorney's fees and costs generated by this appeal.

## V. CONCLUSION

For the aforementioned reasons, we affirm the circuit court's order of protection in favor of Ms. Purifoy in all respects and remand for a determination of attorney's fees to be awarded in connection with this appeal. Costs of this appeal are taxed to the appellant, Devine Mafa. Because Devine Mafa is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
BRANDON O. GIBSON, JUDGE