IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 14, 2024 Session

**ERIKA JEAN SCHANZENBACH v. ALETHEA SKEEN**

**Appeal from the Chancery Court for Sullivan (Bristol) County**
**No. 20-CB-27094      William K. Rogers, Chancellor**
_____

**No. E2023-00457-COA-R3-CV**
_____

This appeal concerns the trial court's denial of a petition for an order of protection based upon allegations of stalking. This is one of four cases in which the petitioner sought an order of protection against four women. We affirm the trial court's denial of the petition in this case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., joined. THOMAS R. FRIERSON, II, J., filed a separate opinion concurring in part and dissenting in part.

W. Andrew Fox, Knoxville, Tennessee, and Martin A. Cannon (pro hac vice) and Michael G. McHale (pro hac vice), Omaha, Nebraska, for the appellant, Erika Jean Schanzenbach.

Alexis Irene Tahinci, Kingsport, Tennessee; Devon Chase Muse, Johnson City, Tennessee; and Laura Hecht-Felella (pro hac vice), Brooklyn, New York, for the appellee, Alethea Skeen.

**OPINION**

**I. BACKGROUND**

Erika Jean Schanzenbach ("Petitioner") has frequented the Bristol Regional Women's Center ("the Clinic") for seven years as a pro-life advocate, commonly referred to as a sidewalk counselor. She holds signs, attempts to speak with women entering the Clinic, and speaks through a "small amplifier" to share her beliefs. Petitioner, who is employed elsewhere, stands outside the Clinic on the roadside on a weekly basis.

Alethea Skeen ("Alethea[1]"), along with Cheryl Hanzlik, Denise Skeen, and Rowan Skeen (collectively "Respondents"), also frequented the Clinic. Their purported purpose was to counter Petitioner's efforts and offer support for those entering the Clinic.

Petitioner and Respondents had several encounters in late 2019 and in January 2020 that led Petitioner to file petitions for orders of protection that would prohibit Respondents from contacting her, coming close to her, causing intentional damage to her property, and interfering with her efforts to assist women at the Clinic. As pertinent to this appeal, Petitioner alleged as follows:

On April 8, 2020, Alethea ran up to me and got directly in my face after I crossed from the east to the west side of Slaughter Street toward [the Clinic]. Alethea was wearing a black face mask depicting a shark-tooth grin, and she was blaring loud music through a bullhorn pointed upward toward my head. Even though a male friend of mine tried to get between Alethea and me in order to protect me, Alethea kicked and shoved his sign, which hit me. She then screamed "Get away from me!" at the top of her lungs and directly in my face multiple times, before pointing for me to return to the east side of Slaughter Street. Alethea, who was also joined for a time by her mother Denise Skeen, then continuously circled around me very closely while continuing to blare the bullhorn noise. Later that same day, Alethea changed her Facebook Profile Cover Photo to a custom-made graphic stating: "erika GO THE [expletive] HOME." . . . That same day, Alethea also posted on her Facebook page that "if the city doesn't start enforcing the stay at home [sic] with the antis things are going to uptick again. And it won't be pretty."

On April 7, 2020, Alethea posted on her Facebook page an apparently custom-made graphic featuring a close up picture of my face next to an in-studio television reporter, with a banner underneath stating: "WCYB[, BREAKING NEWS[:] Erika Denied Her Day in Court." This was in reference to the fact my hearing for protection orders against Alethea and three other respondents that had been postponed due to COVID-19. Alethea also posted a commentary to the graphic in which she noted the hearing had been delayed and stated: "good luck my stalker," followed by a heart symbol.

On January 22, 2020, Alethea followed me very closely as I walked back to my vehicle located hundreds of feet away from [the Clinic], despite my repeated requests that she get away from me. She walked a circle around me in very close proximity to my body. She high-fived my hand without my consent. She told me to engage in a sexual act and stay home in "Mendota,

[1] We will refer to Respondent Alethea by her first name throughout the opinion solely for the purpose of clarity given the involvement of her family members in the other actions.

Virginia," where I live. After I got in my vehicle and Alethea stood watching me close by, she attempted to stick her hand in my window after I had slightly rolled it down to tell her to get away. She then ran alongside and after my vehicle as I drove out of the parking lot.

On January 17, 2020, Alethea picked up a coffee mug that belonged to my friend and fellow pro-life sidewalk counselor with whom I was standing on the right-of-way that day. My friend had earlier set the coffee mug down on the edge of the road (on the east side of Slaughter Street) and walked some feet away. Alethea eventually crossed to the east side of Slaughter Street, and in spite of my warning her that it was private property and didn't belong to her, retrieved the mug, and walked with it back to the abortion facility. Later, after my friend and I had crossed over to the west side of Slaughter Street, Alethea approached within several feet of us and heaved the mug end-over-end directly toward us. The mug flew directly by us and skidded into the street.

On December 23, 2019, Alethea approached me as I stood on the east side of Slaughter Street (the opposite side from [the Clinic]), crowded into my personal space while holding a large, open umbrella, told me to engage in a sexual act, high-fived my hand as I held it up in front of my face, and refused to back off and stop touching me despite my repeated requests that she do so. She then followed me well within my personal space as I walked up and down the street, stepping on my feet, grabbing me along my sides from behind, and dancing in a sexually suggestive manner right up against me despite my personal requests that she back off. When her sister, Rowan, grabbed the leaflets out of my pocket and threw them on the ground, Alethea picked them up and crumpled and destroyed them with her hands. She continued to crowd into my personal space and follow me wherever I walked despite my requests that she back off and stop touching me and my attempts to move away from her to a different area of the public right of way. Eventually a police officer showed up and separated Alethea and Rowan from me and advised that I file a police report of the incident.

On November 13, 2019, despite my many requests that she stop doing so, Alethea repeatedly pushed her body up against mine as I attempted to counsel people on the west side of Slaughter Street. She crowded so close to me that she pushed me eastward out into the street. She also followed me at extremely close range as I walked up and down the public right of way outside the [C]linic. She did all this despite my repeated requests that she back off.

On October 2, 2019, with no sign of rain, Alethea and her sister Rowan

- 3 -

crowded into my personal space on the east side of Slaughter Street while holding their open umbrellas. Alethea licked my bare hand and forearm multiple times as I held it up to try to create some personal space, despite my protests for her to stop. She also positioned herself behind me multiple times and grabbed/tickled my sides by my waist, despite my repeated instructions to her to stop touching me. She also pushed up against the sign I was holding despite my requests that she back off and stop touching me. She also followed me at very close range as I walked up and down Slaughter Street despite my requests that she back off. I tried many times to walk away from her to a different area of the public right of way, but she continued to follow me and refused to let me deescalate the situation. Alethea and Rowan continued this behavior even after all patients had left the [C]linic, thus confirming their intent to target and harass me rather than "protect" patients from my attempts to reach out to them and offer help.

In two other incidents, on September 18 and August 14, 2019, respectively, Alethea followed me as I walked back to my car a substantial distance from the [C]linic. Alethea physically encroached into my personal space despite me being nowhere close to the [C]linic and completely unable to communicate with patients at the time. She did so despite my repeated requests that she stop following me.

On September 4, 2019, Alethea pushed her body up against me while holding her large, open umbrella as I attempted to counsel people on the west side of Slaughter Street, despite my repeated requests that she not touch me. When I crossed over to the east side of Slaughter Street to move away from her, Alethea soon also crossed the street and, joined now by her mother Denise continued encroaching into my personal space. Alethea shrieked at me to "suck it up, you little bitch."

On September 3, 2019, Alethea posted on her Facebook page about the fact that day she stood "in front of [me] to obscure [my] sight." She acknowledged that she "snuggled" against my sign and then wrote: "if you don't want [to be] blocked stay home babydoll. you do not have a right to an audience. you know who I'm standing in front of tomorrow?? sweet old Erika."

On August 28, 2019, Alethea approached me on the east side of Slaughter Street and aggressively bumped into my sign. She continued to stand directly against my sign and directly in my face, telling me she didn't need to back off because "you're on a public road." She also screamed: "Take me to court! And end all this! Either take me to court or this is your [expletive] life now Erika."

- 4 -

On August 14, 2019, Alethea aggressively approached me on the east side of Slaughter Street and, while holding a large rainbow-colored umbrella, continually pushed and leaned against my sign, saying the fact it's on a public road gives her a right to do so, despite my objections. She followed me when I tried to move away from her to a different part of the street. She then hooked her entire arm onto my sign and told me I was a "piece of shit" when I told her she needs to stop. She continued to follow me when I tried to move away, and then she rested her armpit on my hand as she again latched onto and leaned against my sign. She also stood alongside me holding the umbrella handle inches from my body while the open umbrella covered my sign from public view.

On August 7, 2019, Alethea approached me near [the Clinic's] south driveway along West State Street, where she stood right in my face, stepped on my feet, and pressed her face up against my arm and hand while I tried to keep her away from my body. She did all this while holding a large, open rainbow-colored umbrella and despite my requests that she back away. She responded that "it's a public sidewalk, I can stand wherever the [expletive] I want."

On July 31, 2019, Alethea approached me on the east side of Slaughter Street and stood continuously and directly in my face. She then blared a bullhorn directly in my face, repeatedly shouting at me to "Shut the [expletive] up" and then repeatedly blaring the words "Stop Speaking [or Talking] to Me!" directly in my face no less than 37 times.

On July 17, 2019, Alethea approached me on the east side of Slaughter Street and followed me wherever I walked, even when I tried to move away from her multiple times by walking up and down the eastern edge of the road. She also bumped her chest directly and aggressively into my body and stepped on my feet. When I told her to stop stepping on my feet, she said "then go away," acknowledging she was indeed stepping on feet. She engaged in lewd dance moves directly near my body and scolded me to go home.

On July 3, 2019, as I tried to counsel people by speaking gently through my hand-held amplification device (which I began using because of Alethea's and others' efforts to disrupt and drown out my message) Alethea confronted me with a much louder bullhorn, directed toward me, on the west side of Slaughter Street. Alethea sang unintelligible noises into her bullhorn to prevent me from communicating with anyone. As I tried to step away from her, she followed me and continued singing into her bullhorn pointed directly at me. She also repeatedly voiced police siren noises into her bullhorn. By this point she was joined by her father, James Skeen, who used his own

bullhorn to play "feedback" noises from a handheld device and from his smart phone. Together their conduct harassed me and forced me to walk away.

Alethea's conduct is entirely illegitimate and prevents my legitimate and legal efforts at counseling women in need. Inasmuch as my counseling will continue, Alethea's conduct will continue. She has assured me of that on several occasions, saying that if I don't like what she does, "All you've got to do is go home," and "shut the [expletive] up." Alethea has taunted me for being afraid, and says "You can expect this [inaudible] every week, Erika. This is what you have to look forward to every week." She also states: "Stop coming to the [C]linic and this all ends."

All of these incidents have caused me significant mental suffering and distress, and have caused me to feel terrorized, frightened, intimidated, threatened, harassed, and molested. All of these incidents would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

In sum, Petitioner alleged that Alethea stalked her by physically and verbally harassing her, blaring sirens in her face, and shadowing her along the sidewalk.

The trial court did not issue temporary ex parte orders of protection and denied Petitioner's request to consolidate the four cases. The court consolidated the hearings in the interest of judicial economy but maintained each petition as a separate action.

The consolidated hearing occurred on August 4, 2020, at which time Petitioner submitted lengthy video evidence of her interactions with Respondents for the court's consideration. As to Alethea, Petitioner alleged that Alethea engaged in at least 16 separate acts of stalking between July 2019 and April 2020. She claimed that Alethea frequently crowded her space, pushed a large umbrella in her face, blared music in her face, blew into her face, followed her along the street while stepping on her feet, bumped her chest into her body, issued verbal insults that were, at times, of a sexual nature, and pushed and leaned into her signage. Alethea continued in her behavior, despite Petitioner's requests for her to stop. Alethea also posted to her social media account warnings to Petitioner and described her interactions with Petitioner for those following her social media page. As to each Respondent, Petitioner testified that she felt anxious prior to her self-designated day at the Clinic and that she felt exhausted and, at times, "violated" following her encounters with them. She claimed she had difficulty working on the days she spent time at the Clinic. She agreed that she was able to sleep upon her return home after a glass of wine to settle her anxiety.

Respondents did not submit evidence for the court's consideration.

- 6 -

The trial court denied the petition for the order of protection, stating that Petitioner failed to establish her allegations of stalking within the meaning of Tennessee Code Annotated section 39-17-315(a)(4).[2] The trial court dismissed the action without prejudice, utilizing a form order that did not contain findings of fact and conclusions of law in support of the decision. Upon appeal to this court, we vacated the ruling and remanded for the issuance of sufficient findings of fact and conclusions of law. *Schanzenbach v. Skeen*, No. E2020-01196-COA-R3-CV, 2022 WL 3696884 (Tenn. Ct. App. Aug. 26, 2022).

During the pendency of the appeal, the United States Supreme Court issued its ruling in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), in which it held that the federal constitution does not provide a right to abortion. The Clinic at issue here was closed. A similar clinic opened nearby in Virginia.

Upon remand, Petitioner requested a new hearing to update the record due to the passage of time, the Court's ruling in *Dobbs*, and related changes in Tennessee. Respondents opposed Petitioner's request. The court denied further hearing and entered a new order with findings of fact and conclusions of law in support of its original dismissal of the petition. The court found that there was no medical proof of emotional distress and that the videotaped evidence did not support a claim of significant mental distress. The court explained that Petitioner was seen putting her hands on others and that her continued interactions did not reflect someone who had been terrorized, frightened, intimidated, threatened, harassed, or molested. The court further noted that the police were often present in the videos, along with many other people. The court provided that Petitioner voluntarily continued to appear at the Clinic and that the presence of both parties at the Clinic served a legitimate purpose. This second appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A.      Whether sufficient evidence was presented to establish Petitioner's allegations of stalking in the form of harassment at the Clinic.

B.      Whether sufficient evidence was presented to establish Petitioner's allegations of stalking in the form of electronic communication.

C.      Whether this action is now moot as a result of the Clinic's closure.

---

[2] "'Stalking' means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]"

D.      Whether this appeal is frivolous.


## III.  STANDARD OF REVIEW

The trial court may issue an order of protection if "the petitioner has proven the allegation of domestic abuse, stalking or sexual assault by a preponderance of the evidence." Tenn. Code Ann. § 36-3-605(b).  "Proving an allegation by a preponderance of the evidence requires a litigant to convince the trier-of-fact that the allegation is more likely true than not true." *McEwen v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 825 n.19 (Tenn. Ct. App. 2005) (citing *Austin v. City of Memphis*, 684 S.W.2d 624, 634–35 (Tenn. Ct. App. 1984)).

We review this non-jury case de novo upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d).  This presumption of correctness applies only to findings of fact and not to conclusions of law. *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011).

To the extent that this case requires that we construe statutes, our review is also de novo. *Freeman v. Marco Transp. Co.*, 27 S.W.3d 909, 911–12 (Tenn. 2000) ("Issues of statutory construction are questions of law and shall be reviewed de novo without a presumption of correctness.").  In construing statutes, we keep the following guidance in mind:

> Our resolution of this issue is guided by the familiar rules of statutory construction.  Our role is to determine legislative intent and to effectuate legislative purpose.  The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose.  When the language of the statute is clear and unambiguous, courts look no farther to ascertain its meaning.  When necessary to resolve a statutory ambiguity or conflict, courts may consider matters beyond the statutory text, including public policy, historical facts relevant to the enactment of the statute and the entire statutory scheme.  However, these non-codified external sources "cannot provide a basis for departing from clear codified statutory provisions."

*Dallas v. Shelby Cnty. BOE*, 603 S.W.3d 32, 37 (Tenn. Ct. App. 2019) (quoting *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012) (citations omitted)).

## IV. DISCUSSION

### A.

Petitioner claims that the trial court's denial of relief for Alethea's behavior at the Clinic was error when the statute provides that any victim of stalking can obtain relief. Petitioner cites the history of the legislative provisions in support of her claim, noting that the pertinent statutes were expanded beyond the bounds of domestic disputes to include victims of stalking, who may or may not have any prior relationship with the perpetrator.

Orders of protection are statutorily governed by Tennessee Code Annotated section 36-3-601, *et seq.* Prior to 2005, orders of protection were available only to those in domestic relationships, whether related by marriage or otherwise involved in a relationship with the perpetrator. The stated purpose of the statutes was

> to recognize the seriousness of domestic abuse as a crime and to assure that the law provides a victim of domestic abuse with enhanced protection from domestic abuse. A further purpose of this chapter is to recognize that in the past law enforcement agencies have treated domestic abuse crimes differently than crimes resulting in the same harm but occurring between strangers. Thus, the General Assembly intends that the official response to domestic abuse shall stress enforcing the laws to protect the victim and prevent further harm to the victim and the official response shall communicate the attitude that violent behavior is not excused or tolerated.

Tenn. Code Ann. § 36-3-618. In 2005, the General Assembly amended the statutes to also protect victims of sexual assault and stalking, regardless of the relationship between the victim and perpetrator. 2005 Tennessee Laws Pub. Ch. 381 (S.B. 645). However, the legislative purpose and intent of the statutes remained, despite numerous updates to the statutes and the inclusion of sexual assault and stalking victims. *See generally* Tenn. Code Ann. § 36-3-618 (reflecting no substantive changes since 1995).

Pursuant to Section 36-3-602(a), a stalking victim may seek relief from the courts pursuant to Title 36 when such person "has been subjected to, threatened with, or placed in fear of, domestic abuse, stalking, or sexual assault." "'Stalking victim' means any person, regardless of the relationship with the perpetrator, who has been subjected to, threatened with, or placed in fear of the offense of stalking, as defined in [section] 39-17-315." Tenn. Code Ann. § 36-3-601(11). Section 39-17-315(a)(4) defines stalking as

a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

Similarly,

"Harassment" means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose[.]

Tenn. Code Ann. 39-17-315(a)(3). Emotional distress is defined as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." Tenn. Code Ann. § 39-17-315(a)(2). Lastly,

(5) "Unconsented contact" means any contact with another person that is initiated or continued without that person's consent, or in disregard of that person's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:

(A) Following or appearing within the sight of that person;

(B) Approaching or confronting that person in a public place or on private property;

(C) Appearing at that person's workplace or residence;

(D) Entering onto or remaining on property owned, leased, or occupied by that person;

(E) Contacting that person by telephone;

(F) Sending to that person mail or any electronic communications, including, but not limited to, electronic mail, text messages, or any other type of electronic message sent using the internet, websites, or a social media platform; or

(G) Placing an object on, or delivering an object to, property owned, leased, or occupied by that person[.]

- 10 -

Citing *PLT v. JBP*, No. 346948, 2019 WL 7206134 (Mich. Ct. App. Dec. 26, 2019), Petitioner claims that she was entitled to an order of protection under the circumstances presented here. In *PLT*, the appellate court in Michigan upheld a trial court's grant of an order of protection against a pro-life advocate for his behavior toward an employee at an abortion clinic. 2019 WL 7206134, at *7. The respondent argued that his protests were constitutionally protected conduct serving a legitimate purpose, which cannot constitute harassment within the meaning of the Michigan statutes. *Id.* at *3. In determining whether to uphold the order, the court in *PLT* noted that an individual's right to free speech must be considered alongside the right for others "to be let alone." *Id.* at *3–4 (citing *Hill v. Colorado*, 530 U.S. 703, 716–17 (2000)). Acknowledging that while "[p]ublic protests regarding abortion, whether in support or opposition, serve legitimate political purposes," the court held that respondent's actions "exceeded the permissible scope of the activity" and violated the petitioner's right to be let alone. *Id.* at *4. The court noted that the respondent went beyond his political message and targeted the petitioner, directing his comments toward her when other workers were present. *Id.* The court continued,

> Respondent's conduct violated petitioner's right to be let alone. Petitioner repeatedly told respondent that he was scaring her and to get away from her. Respondent ignored these requests. Accordingly, respondent was aware that his conduct was having a negative impact on petitioner. Despite this knowledge, respondent continued to approach petitioner. Consequently, the trial court could reasonably find, as it did, that respondent was no longer simply seeking to share his political viewpoint with someone who might be receptive to his beliefs. Instead, respondent was antagonizing an individual who knew his views, did not share them, did not wish to hear them, and had repeatedly asked him to stop because he was scaring her. Such conduct was no longer constitutionally protected because respondent violated petitioner's right to be let alone when he repeatedly attempted to press his ideas on an unwilling participant. Respondent's conduct no longer served a legitimate purpose because it exceeded the scope of his general anti-abortion protest, having moved from advocacy to threatening conduct. Accordingly, respondent's behavior instead became that of an individual continually accosting someone who repeatedly asked him to stop and told him that he was scaring her. Thus, because respondent's conduct did not serve a legitimate purpose, it was not constitutionally protected.

*Id.*

Here, Petitioner argues that the reverse scenario was present in this case, namely Alethea's conduct moved from legitimate advocacy protected by her right to free speech to threatening conduct, despite Petitioner's repeated requests to leave her alone. Alethea responds that the court's opinion in *PLT* is neither binding nor applicable. She distinguishes her behavior by claiming that she complied with Petitioner's request not to

- 11 -

touch and that she and Petitioner engaged in conversation, namely she told Petitioner to go home, albeit in colorful language, while Petitioner accused her of supporting a place of murder and bloodshed.

We must first note that the parties' treatment of clinic patients is not at issue in this case. Further, unlike the facts presented in *PLT*, neither party is employed by the Clinic. The matter before this court concerns the behavior between protestors from opposing sides that also involves a balancing act between the right to free speech and the right to be let alone as presented in *PLT*. The parties each appear at the Clinic voluntarily and with an entourage. They engage frequently enough to know each other on a first name basis. Petitioner defends herself, shares her opinion of the competing side openly and freely, and returns week after week.[3] In return, Respondents attempt to prevent Petitioner from interacting with patients at the Clinic. At times, the police are also present and operate to separate the two opposing groups. Interactions between Petitioner and the Respondents are limited to the issue of their opposing viewpoints on abortion.

Additionally, the trial court found that there was no medical proof of emotional distress and that the videotaped evidence did not support a claim of significant mental distress. The court explained that Petitioner was seen putting her hands on others and that her continued interactions did not reflect someone who had been terrorized, frightened, intimidated, threatened, harassed, or molested. The record confirms that Petitioner was able to calm herself from her time at the Clinic with a glass of wine before bed. We agree with the trial court's assessment that Petitioner established no proof of emotional distress to support her claims. The court further noted that the police were often present in the videos, along with many other people. The court provided that Petitioner voluntarily continued to appear at the Clinic and that the presence of both parties at the Clinic served a legitimate purpose. The evidence does not preponderate against the trial court's findings. In consideration of the foregoing, we affirm the trial court's denial of the petition as it related to the claims of stalking in the form of harassment at the Clinic.

B.

Next, Petitioner asserts that the trial court further failed to consider Alethea's social media posts as stalking in accordance with this court's decision in *Purifoy v. Mafa*, 556 S.W.3d 170, 189–190 (Tenn. Ct. App. 2017). In *Purifoy*, the petitioner ("Ms. Purifoy") was an attorney who testified at a hearing concerning the respondent ("Dr. Mafa"), an occupational therapist. 556 S.W.3d at 175. Ms. Purifoy testified on behalf of a student who sought an order of protection against Dr. Mafa. *Id.* Her testimony was not favorable toward Dr. Mafa; however, the proceeding was ultimately dismissed with no order of

---

[3]We acknowledge that Petitioner ceased her protesting activities for approximately two months following an alleged incident of assault on May 27, 2020, but she has since returned.

protection issued. *Id.* Approximately eight months later, Ms. Purifoy was alerted to a series of lengthy posts and videos about her on Facebook that were posted by Dr. Mafa. *Id.* at 176.

On December 14, 2013, Ms. Purifoy contacted Dr. Mafa through direct message on Facebook and asked him to remove the posts. *Id.* at 176. He neither responded nor removed the posts. *Id.* She then filed a complaint in circuit court against Dr. Mafa, alleging defamation in the form of libel and negligent or intentional infliction of emotional distress. *Id.* She sought an immediate temporary restraining order and injunctive relief concerning the postings. *Id.* He did not respond through the court system. Instead, he posted yet another message on Facebook in the form of a motion to dismiss. *Id.* at 176–77. The message provided, in pertinent part, as follows:

> Hey Yee Lord, Judge in the chamber wearing the black hood looking all important, comes he before yee this scholarly defendant named Steele Balz. He seek[s] to dismiss and throw away this docket into the trash where the pigs reside[.] [The Communication Decency Act] gives him his godly powers to [speak] as he pleases on the computer[.]
>
> * * *
>
> Your judgement for her would change American law and warn you. [W]e are watching you judge.

*Id.* Dr. Mafa later posted a picture of the petitioner he obtained from a bulletin juxtaposed with a picture of his ex-girlfriend. *Id.* at 177.

On December 31, 2013, Ms. Purifoy had a brief encounter with Dr. Mafa at a bar, the events of which were described by a panel of this court in the *Purifoy* case as follows:

> Ms. Purifoy had previously informed the bouncer that she was trying to obtain service of process on Dr. Mafa. When she arrived with a friend on New Year's Eve, the bouncer told them that Dr. Mafa was inside. Ms. Purifoy called the private process server then proceeded inside. The private process server never came. Ms. Purifoy and Dr. Mafa had a brief encounter at the bar, but their versions of what occurred vary tremendously. According to Ms. Purifoy, she approached Dr. Mafa and said something along the lines of "Don't you think you shouldn't be here?", but Dr. Mafa acted like he did not know Ms. Purifoy, so she turned and walked away.

*Id.* at 177. On January 1, 2014, Dr. Mafa posted another picture with a lengthy post on his Facebook page in which he described the interaction at the bar. *Id.* He described her body and appearance and said she "was turning me on" by making wild gestures. *Id.* The next

- 13 -

day, he filed a complaint against Ms. Purifoy, alleging assault. *Id.*

The trial court issued a permanent injunction against Dr. Mafa on January 13, 2014. *Id.* On January 23, 2014, Dr. Mafa appeared at the Family Service Center, where Ms. Purifoy maintained an office. *Id.* at 178. He was not permitted to enter the building. *Id.* He later asserted that he was there to obtain an order of protection against her but that he was unaware she maintained an office in the building. *Id.* On February 20, Dr. Mafa was spotted again at the Family Service Center, shortly after 6 p.m. in the parking lot. *Id.*

On February 26, Ms. Purifoy filed a petition for an order of protection, alleging stalking. *Id.* The court issued an ex parte order of protection immediately, finding that Ms. Purifoy was under an immediate and present danger of abuse. *Id.* Following a hearing, the trial court granted Ms. Purifoy an order of protection against Dr. Mafa for one year. *Id.* at 188.

Upon appeal to this court, Dr. Mafa argued, inter alia, that his Facebook posts did not constitute "contact" within the meaning of the statutory definition of stalking because the posts were on his social media page, not Ms. Purifoy's. *Id.* at 188–89. This court disagreed, finding that electronic communications such as posts on Facebook qualified as contact or communication. *Id.* at 190. The court further held that Ms. Purifoy viewed the postings, that her requests to remove them were ignored, and that his repeated unconsented contact through the postings and in person visits to her place of employment "caused Ms. Purifoy to subjectively experience significant distress within the meaning of the statute." *Id.* at 191.

Here, the record reflects that Alethea posted on her Facebook page in reference to Petitioner on three separate dates. On September 3, 2019, Alethea wrote that she stood in front of Petitioner to obscure her sight and that she "snuggled" her. She continued,

> If you don't want blocked stay home babydoll. [Y]ou do not have the right to an audience. [Y]ou know who I'm standing in front of tomorrow. Sweet old Erika.

On April 7, 2020, Alethea posted a custom graphic on her Facebook page featuring a picture of Petitioner's face next to an in-studio reporter with a caption reading, "ERIKA DENIED HER DAY IN COURT." In the post itself, Alethea wrote,

> Erika was supposed to have her day in court today (getting an order of protection against someone she comes to stalk weekly) but it's pushed back until at LEAST June.
>
> [G]ood luck my stalker[.]

- 14 -

(nobody even remembered it was supposed to be today including us)

The next day, on April 8, Alethea changed her Facebook cover photo to a custom graphic stating, "ERIKA GO THE =UCK HOME." She then posted the following comment on her Facebook page:

> [I]f the city doesn't start enforcing the stay at home order with the antis[4] things are going to uptick again. And it won't be pretty.

We agree with Petitioner that Alethea's Facebook posts qualify as repeated unconsented contact within the meaning of the statute. The question remains as to whether these posts actually caused Petitioner to feel terrorized, frightened, intimidated, threatened, harassed, or molested. *See* Tenn. Code Ann. § 39-17-315(a)(4) (requiring such a finding to sustain an allegation of stalking necessitating the issuance of an order of protection). The trial court heard the testimony of the witnesses and found that Petitioner failed to establish the requisite mental distress to establish her claims. Our review of the record reflects that Petitioner did not offer testimony concerning her feelings of distress directly related to the Facebook postings but offered her general sense of distress following the in-person interactions with Respondents. Petitioner also did not establish that she requested the removal of the posts as the petitioner did in *Purifoy*. With all of the above considerations in mind, we affirm the trial court's denial of the petition as it related to the unconsented contact in the form of electronic communication.

## C.

We acknowledge that time has marched on since the filing of our initial decision in which we remanded this matter to the trial court. Accordingly, in the event of further appellate review, we will address Alethea's assertion that this action is now moot because the Clinic no longer exists. Alethea further explains that the parties have not interacted for some time as a result of the closure of the Clinic. Petitioner acknowledges the closure of the Clinic identified in her petitions but submits that an order of protection entered in Tennessee would operate to bar further stalking in the form of harassment from Respondents at the new clinic located in Virginia. She further asserts that any voluntary cessation of illegal activity cannot support a finding a mootness when the Respondents will be free to resume the same conduct once the action has been dismissed as moot.

Courts limit their role to deciding "'legal controversies.'" *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam County*, 301 S.W.3d 196, 203 (Tenn. 2009) (quoting *White v. Kelton*, 232 S.W. 668, 670 (Tenn. 1921)). A proceeding is deemed a legal controversy

---

[4] The record reflects that Alethea referred to the Petitioner and others as "antis," seemingly in reference to their views against abortion.

- 15 -

"when the disputed issue is real and existing, and not theoretical or abstract, and when the dispute is between parties with real and adverse interests." *Id.* (citations omitted). "A moot case is one that has lost its justiciability either by court decision, acts of the parties, or some other reason occurring after commencement of the case." *Id.* at 204. "[W]hen the question of mootness is raised, [courts] consider many factors, including the reason that the case is alleged to be moot, the stage of the proceeding, the importance of the issue to the public, and the probability that the issue will recur." *Id.*

Petitioner is correct in her assertion that a protection order issued in this state would be afforded full faith and credit in Virginia.[5] However, issuing such an order at this stage of the proceedings would operate as an advisory or theoretical opinion when the disputed issue between the parties is no longer real and existing in this state. Accordingly, we hold that this action has been rendered moot by the closure of the Clinic.

D.

Alethea asserts that this new appeal is frivolous and lacking of justiciable issues, thereby entitling her to attorney's fees on appeal. Tennessee Code Annotated section 27-1-122, provides that:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122.

The decision whether to award damages for a frivolous appeal rests solely in our discretion. *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009). Appellate courts exercise their discretion to award fees under this statute "'sparingly so as not to discourage legitimate appeals.'" *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017) (quoting *Whalum v. Marshall*, 224 S.W.3d 169, 181 (Tenn. Ct. App. 2006)). "'Successful litigants should not have to bear the expense and vexation of groundless appeals.'" *Whalum*, 224 S.W.3d at 181 (quoting *Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977)). "A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that it can ever succeed." *Indus. Dev. Bd. v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995). Exercising our discretion in such matters, we respectfully

---

[5] "Any protection order issued . . . by the court of one State [] shall be accorded full faith and credit by the court of another State [] and enforced by the court and law enforcement personnel of the other State [] as if it were the order of the enforcing State[.]" 18 U.S.C. § 2265.

deny Alethea's request for fees on appeal.

## V.  CONCLUSION

For the reasons stated above, we affirm the decision of the trial court.  The case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellant, Erika Jean Schanzenbach.

_____
JOHN W. MCCLARTY, JUDGE